

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0306-14

### THE STATE OF TEXAS

### v.

### DAVID VILLARREAL, Appellee

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### NUECES COUNTY

ALCALA, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, and COCHRAN, JJ., joined. KELLER, P.J., filed a dissenting opinion in which HERVEY, J., joined. MEYERS, J., filed a dissenting opinion. KEASLER, J., dissented.

### O P I N I O N

In this case, we are asked to decide whether the warrantless, nonconsensual drawing of blood from an individual suspected of driving while intoxicated, conducted pursuant to the implied-consent and mandatory-blood-draw provisions in the Texas Transportation Code, violates the Fourth Amendment. *See* U.S. CONST. amend. IV; TEX. TRANSP. CODE §§ 724.011(a), 724.012(b), 724.013. This question comes to us in the form of an interlocutory appeal filed by the State challenging the trial court's order granting a motion to suppress in favor of David Villarreal, appellee, who was

arrested for felony DWI and subjected to warrantless blood-specimen collection over his objection pursuant to the provisions in the Code. In its petition for discretionary review, the State challenges the trial court's and the court of appeals's conclusion that the warrantless search of Villarreal's blood under statutory authority providing for implied consent and mandatory blood-specimen collection violated the Fourth Amendment. *See State v. Villarreal*, No. 13-13-00253-CR, 2014 WL 1257150 (Tex. App.—Corpus Christi Jan. 23, 2014). It further challenges two specific aspects of the court of appeals's analysis by contending that the court erred in concluding that (1) the State forfeited its implied-consent argument on appeal by stipulating to the fact that Villarreal did not consent to the blood draw, and (2) the mandatory-blood-draw statute, by its terms, does not dispense with the warrant requirement.

In addressing the merits of the State's challenge to the trial court's ruling, we conclude that the warrantless, nonconsensual testing of a DWI suspect's blood does not categorically fall within any recognized exception to the Fourth Amendment's warrant requirement, nor can it be justified under a general Fourth Amendment balancing test. Accordingly, we hold that the search in this case violated the Fourth Amendment. With respect to the State's specific complaints regarding the court of appeals's analysis, we conclude that, although the court of appeals erred by determining that the State forfeited its implied-consent argument on appeal through stipulation, remand is unnecessary in light of both the court of appeals's implicit rejection of that argument and our express rejection of that argument in our analysis today. We further conclude that the court of appeals erred to address the constitutionality of the mandatory-blood-draw statute and, in light of our holding in this case, we decline to review the State's complaint with respect to that matter. We affirm the trial court's ruling suppressing the blood-test results.

## I. Background

Applying the law to the undisputed facts, the court of appeals upheld the trial court's ruling granting the motion to suppress the results of Villarreal's blood test.

### A. The Facts

One Saturday evening in 2012, Villarreal was stopped for a traffic violation. The officer who made the stop, Officer Preiss, observed that Villarreal had signs of intoxication, and he contacted another officer, Officer Williams, to conduct a DWI investigation. Upon arrival at the scene, Williams observed that Villarreal was exuding a strong odor of alcohol, was swaying back and forth, and had red, watery eyes and slurred speech. Williams requested that Villarreal perform standardized field sobriety tests, but he refused. Believing Villarreal was intoxicated, Williams arrested him on suspicion of DWI. Williams then gave Villarreal a written statutory warning requesting that he provide a blood specimen and advising him that, if he refused to provide a specimen, his refusal may be admissible in a subsequent prosecution and would result in the suspension or denial of his driver's license for not less than 180 days. Villarreal refused.

After a criminal-history check revealed that Villarreal had been convicted of DWI on several occasions, Williams transported him to a hospital and requested that a qualified technician draw his blood over his objection. Williams prepared a written report averring that he had probable cause to believe that Villarreal had committed the offense of DWI and that, based on reliable information possessed or received from a credible source, Villarreal had previously been convicted of or placed on community supervision for DWI on two or more occasions. The report stated that Williams was "invoking [his] authority under [Texas Transportation Code], Section 724.012(b), to require the

suspect to submit to the taking of a specimen of the suspect's blood." *See* TEX. TRANSP. CODE § 724.012(b)(3)(B) (statute providing for mandatory-blood-specimen collection for person twice before convicted of DWI). The qualified technician drew Villarreal's blood, which, upon testing, revealed a blood-alcohol concentration of .16 grams of alcohol per hundred milliliters of blood.

## B. The Trial Court Proceedings

Given his multiple prior convictions for DWI, Villarreal was indicted for felony DWI.[1] He filed a written motion to suppress the results of his blood test. In his motion, Villarreal averred that there was no "deemed consent to the taking of a blood specimen."[2] The trial court conducted an evidentiary hearing, at which Williams was the sole witness. Williams stated that he "could have" obtained a warrant, but believed he "did not statutorily have to" in light of the mandatory-blood-draw provision in the Code.[3] He further stated that his decision to require the taking of the specimen was based solely on the statutory authorization and not on any emergency at the scene or the existence

---

[1]    *See* TEX. PENAL CODE §§ 12.42(d), 49.04, 49.09(b). Villarreal's indictment for driving while intoxicated alleged that, on or about March 31, 2012, he did operate a motor vehicle in a public place while intoxicated. The indictment further alleged that he had twice before been convicted of misdemeanor offenses in 1988 and 1994 "relating to the operating of a motor vehicle while intoxicated," and that he had twice before been convicted of felony DWI, once in 2001 and once in 2005, with the 2005 conviction being for an offense that occurred after the 2001 conviction became final. On the basis of Villarreal's two prior felony convictions, the State sought to enhance his punishment range to one carrying a minimum term of imprisonment of twenty-five years up to a maximum sentence of life imprisonment. *See id.* § 12.42(d).

[2]    Villarreal's written motion also asserted that the blood-test results should be suppressed because the officers conducted his arrest and search without a valid warrant, reasonable suspicion, or probable cause; that the officers failed to read him the required statutory warnings under Transportation Code Section 724.015; that he did not voluntarily consent to the blood test; and that the statute purportedly authorizing the taking of his blood without a warrant should be held unconstitutional. These additional claims were abandoned at the suppression hearing.

[3]    *See* TEX. TRANSP. CODE § 724.012(b).

of exigent circumstances. Aside from Williams's testimony, the parties additionally stipulated that Villarreal's "blood was drawn without his consent and without a warrant."

After the close of evidence, Villarreal's attorney argued that the Supreme Court's recent decision in *Missouri v. McNeely* held that, in the absence of exigent circumstances, a DWI suspect's blood may not be drawn without a warrant, and he further argued that the federal Constitution overrides the Texas statute that authorizes a mandatory blood draw in certain situations. *See Missouri v. McNeely*, 133 S. Ct. 1552 (2013); TEX. TRANSP. CODE § 724.012(b). The State's attorney disagreed that *McNeely* affected the validity of Texas's mandatory-blood-draw provision and, based on the fact that a portion of *McNeely* was a plurality opinion, she asserted that its holding did not necessarily disapprove of this type of mandatory statutory blood draw conducted pursuant to implied consent. After the attorneys' arguments, the trial court granted Villarreal's motion.

The State filed a motion asking the trial court to reconsider its ruling. In its motion, the State repeated its arguments interpreting the meaning of the *McNeely* decision. The State asserted that *McNeely* is generally inapplicable to situations involving a mandatory blood draw through implied consent in that *McNeely* addressed only exigent circumstances and did not address other Fourth Amendment exceptions. The State also asserted that *McNeely* included language signifying that the Supreme Court remains open to implied-consent laws as an alternative to a warrant. The State contended that the plurality portion of the *McNeely* opinion signified that "there appears to be a differently-constituted-five-vote block [sic] that remains open to a modified rule departing from the warrant requirement in circumstances other than a *per se* blood-alcohol exigency." It suggested that the Supreme Court's language contained "positive references" to implied-consent laws and "in no way disapproved of the States' carefully tailored implied consent schemes where only specified and

limited situations authorized compelled blood draws after refusal," and when such searches are based upon probable cause.

The State's motion to reconsider additionally made three specific arguments, which are discussed more fully below, in support of its broader contention that a warrantless, nonconsensual search conducted pursuant to the statutory authority in the Transportation Code does not violate the Fourth Amendment: (1) Courts should uphold such a search under the consent exception to the warrant requirement, appearing in the form of a waiver obtained through implied consent; (2) courts should consider whether some other exception to the search-warrant requirement might apply, such as expansion of the automobile exception into an automobile-driver exception or application of the special-needs exception; and (3) courts should conduct a balancing of governmental and private interests and find that a warrantless search of a DWI suspect's blood is generally reasonable in light of the minimally intrusive nature of a blood draw and the State's substantial public interest in protecting against drunk driving.

In its first argument, the State asserted that "a defendant's implied consent is valid as an exception to the warrant preference." It suggested that a defendant, by driving on Texas roadways, which is a privilege and not a right, has impliedly consented to have his blood drawn under the limited situations described in the mandatory-blood-draw provision, and he thus waives any right to later complain about a warrantless search conducted pursuant to that provision. The State asserted that, unlike consent in the traditional sense, such a waiver of Fourth Amendment rights applies "in spite of the suspect's protest at the time of the search in question." The State contended that the "Supreme Court has long recognized a parallel exception [to the consent exception] in the form of a prior waiver of the Fourth Amendment rights to probable cause and a warrant as a condition for

some benefit extended to the suspect from the State." In the case of the mandatory-blood-draw statute, "which the law presumes the driving public to have read," the State suggested that "the driver impliedly agrees ahead of time that, in exchange for the privilege of driving on our roads, he is willing to waive the right to a warrant in these limited circumstances."

The State's second argument advocated for the broadening of the automobile exception to the warrant requirement into an automobile-driver exception, or, alternatively, application of the special-needs doctrine. The State claimed that, just as society has a lessened expectation of privacy in automobiles in light of their "ready mobility" and the "pervasive regulation of vehicles," a driver's expectation of privacy in his blood is similarly diminished because he is "just as mobile as his vehicle, [and] just as subject to pervasive licensure and regulation[.]" It suggested that a driver's normal expectation of a warrant yields to common concerns inherent in a "highly regulated activity in which the driver freely chooses to engage." Drivers, it asserted, are "on notice of the lessened degree of privacy protection in matters that concern the safety of the roads on which they drive," and they should know that "their blood can be drawn without a warrant" under the conditions specified by statute. On that basis, it urged the court to "recognize a driver exception to the warrant requirement coextensive with the vehicle exception."

The State's third argument suggested that a Fourth Amendment balancing test should favor a warrantless blood draw by weighing the minimal intrusion of a blood draw against the substantial public interest in protecting against drunk driving. The State contended that, even short of a free-standing exception in the nature of the traditional exceptions to the warrant requirement, "the courts should allow the States to craft such an exception" to the warrant requirement based on the "substantial public interest in ridding the road of drunk drivers," as compared to only a "slight"

invasion of a privacy interest through a minimal pin prick to the skin. Noting that the Legislature's objective for adopting the mandatory-blood-draw law applicable to this case was to "save lives," the State's attorney observed that Texas has the nation's worst drunk-driving problem and its citizens "face a uniquely disproportionate risk of being killed or injured by drunk drivers, compared to any other State." In contrast to the State's and society's substantial interest in curbing drunk driving, the State's attorney averred that a DWI suspect has a diminished privacy interest in his blood in light of the existence of implied consent and the highly regulated nature of driving. As for the nature of the intrusion itself, the State's attorney argued that a pin prick to take a person's blood constitutes only a slight invasion of an individual's privacy because these types of tests are considered routine by most people.

After the State filed its motion asking the trial court to reconsider its ruling, the trial court made findings of fact and a conclusion of law impliedly denying the State's motion. In pertinent part, the trial court's findings of fact determined that Officer Williams credibly assessed the facts showing that Villarreal was intoxicated and had twice before been convicted of DWI; that Villarreal's blood was drawn without a warrant and without his consent; and that there were no exigent circumstances preventing the officer from obtaining a warrant.[4] The trial court's single conclusion of law stated, "The Court concludes that the Defendant's blood was illegally obtained without a warrant and in the absence of a recognized exception to the warrant requirement, and that the statutory blood draw was invalid and unconstitutional without exigent circumstances to support

---

[4] The remainder of the trial court's findings of fact determined that Villarreal narrowed the grounds in his motion to include only his claim that "taking a blood draw without a warrant [is] a violation of the 4th Amendment," such that he abandoned any claim that he was illegally arrested or that the statute itself was unconstitutional.

the absence of a warrant."

**C. The Court of Appeals Opinion**

After the State filed an interlocutory appeal challenging the trial court's ruling in favor of Villarreal, the court of appeals affirmed the ruling suppressing the results of the blood test. *Villarreal*, 2014 Tex. App. LEXIS 645, 2014 WL 1257150, at *1, 11. In its sole issue on appeal, the State contended that the trial court erred by granting Villarreal's motion to suppress on the basis that the blood draw was involuntary and conducted without a warrant, and it asserted that the "repeat offender" provision of the mandatory-blood-draw statute could serve as a valid basis for upholding the search. *See* TEX. TRANSP. CODE § 724.012(b)(3). In rejecting the State's position, the court of appeals determined that (1) notwithstanding the officer's compliance with the mandatory-blood-draw provision, the warrantless blood draw in this case violated the Fourth Amendment, and (2) the mandatory-blood-draw statute was not unconstitutional. *Villarreal*, 2014 WL 1257150, at *8-11.

**1. Court of Appeals Held that Fourth Amendment Violation Occurred**

The court of appeals addressed the arguments that the State had presented to the trial court in support of its claim that the warrantless search of Villarreal's blood did not violate the Fourth Amendment. With respect to the State's broad claim that the *McNeely* holding was inapplicable to this case and included language signifying that the Supreme Court was open to implied-consent laws as an alternative to a search warrant, the court of appeals disagreed. *Id*. at *4, 10. It observed that *McNeely*, which had disavowed a per se rule of exigency for blood draws in DWI cases, signified that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of circumstances." *Id*. at *5. It further cited *McNeely* for the proposition that, "'where police officers can reasonably obtain a warrant before a blood sample can

be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.'" *Id.* at \*10 (quoting *McNeely*, 133 S. Ct. at 1561).

In addressing the State's first specific argument that a driver has waived his right to a warrant through implied-consent laws, the court of appeals initially determined that the State had failed to preserve this argument for appeal, although it then essentially addressed the merits of that argument. The court determined that, by stipulating that Villarreal's blood had been drawn without his consent, the State had forfeited that argument and could not rely on the waiver exception to the warrant requirement. The court of appeals stated, "[T]o the extent that the State argues that there was valid 'consent' under the Fourth Amendment—whether by the mandatory blood draw law or the implied consent law—it is barred from doing so in this appeal by its stipulation before the trial court that in this case '[t]here was no consent, no warrant.'" *Id.* at \*11.

Although it found that the State had forfeited its argument regarding implied consent, the court appeared to address that argument indirectly, stating, "[T]here is a distinction between a consensual blood draw and an involuntary, mandatory blood draw. The implied consent law is premised on consent. In contrast, the mandatory blood draw law is premised on refusal to consent." *Id.* at \*9 (citations omitted) (discussing TEX. TRANSP. CODE §§ 724.011(a), 724.012(b)). It further observed that, although the State appeared to argue that "Chapter 724 creates a legislative consent or essentially a statutory waiver of the Fourth Amendment," that argument was inconsistent with the requirement that consent be given freely and voluntarily. *Id.* at \*10 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *Kolb v. State*, 532 S.W.2d 87, 89 (Tex. Crim. App. 1976)).

The court of appeals indirectly rejected the State's second specific argument that, in addition to consent and exigent circumstances, there are other recognized exceptions to the search-warrant

requirement that could apply to this case. In describing the general law, the court observed that "special needs" is one of the recognized exceptions to the search-warrant requirement. *Id.* at *7. The court implicitly rejected the application of these other exceptions by observing that the "officer's sole basis for not getting a warrant was that the repeat offender provision of the mandatory-blood-draw law required him to take a blood sample without [Villarreal's] consent and without the necessity of obtaining a search warrant." *Id.* at *11.

The court of appeals also addressed the State's third specific argument that the minimal intrusion of a blood draw must be balanced against the substantial public interest in protection against DWI drivers. It disagreed with the State's claims that a driver arrested on suspicion of DWI has a lessened expectation of privacy in his blood. The court of appeals quoted the language from *McNeely* explaining that "an invasion of bodily integrity implicates an individual's most personal and deep-rooted expectations of privacy." *Id*. at *4 (quoting *McNeely*, 133 S. Ct. at 1558). It also cited *Schmerber v. California*, 384 U.S. 757, 771 (1966), for the proposition that, although "the Constitution does not forbid the State's minor intrusions into an individual's body under stringently limited conditions," that principle "in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id*. at *5. Although it recognized that the drunk-driving problem is a national epidemic and that there is a strong governmental interest in curbing DWIs, the court quoted *McNeely*'s observation that "the general importance of the government's interest in this area does not justify departing from the warrant requirement without showing exigent circumstances that make securing a warrant impracticable in a particular case." *Id*. at *4 (quoting *McNeely*, 133 S. Ct. at 1565).

**2.  Court of Appeals Held that Blood-Draw Statute Is Not Unconstitutional**

In addition to agreeing with the trial court's conclusion that the warrantless search of Villarreal's blood constituted a Fourth Amendment violation, the court of appeals considered the constitutionality of the mandatory-blood-draw statute itself, and it determined that the statute was not unconstitutional "as applied" to Villarreal. *Id.* at \*8. In resolving this matter, the court observed that, although the Texas mandatory-blood-draw statute "required the officer to obtain a breath or blood sample, it did not require the officer to do so without first obtaining a warrant. In fact, the statute does not address or purport to dispense with the Fourth Amendment's warrant requirement for blood draws." *Id*. at \*11. In light of its determination that the statute itself does not dispense with the warrant requirement and its conclusion that the Fourth Amendment would require a warrant under these circumstances, the court upheld the trial court's ruling suppressing the evidence. *Id.*

We granted the State's petition for discretionary review to address its contention that the court of appeals erred to hold that a warrantless blood draw conducted pursuant to the provisions in the Transportation Code violates the Fourth Amendment.[5]

**II. Provisions In Transportation Code Do Not Form Constitutionally Valid Alternative to**

---

[5]     The State's petition presents three grounds for review:

1. Whether the Thirteenth Court of Appeals erred in refusing to hold that the mandatory blood draw provisions of the Texas Transportation Code are a constitutionally valid alternative to the warrant requirement.

2. Whether the Thirteenth Court of Appeals erred in holding that the State's stipulation that there was no consent to the blood draw amounted to a waiver of the "implied consent" or "deemed consent" argument under the Transportation Code.

3. Whether the Thirteenth Court of Appeals erred in concluding that the mandatory blood draw statute does not allow the arresting officer to draw blood without a search warrant or exigent circumstances, and specifically whether the court failed to consider the distinction between the statutory directive for the arresting officer to require or order the draw, and the nature of a warrant as an order of the issuing magistrate for the draw in question.

**Warrant Requirement**

In its first ground for review, the State contends that the court of appeals erred by holding that the provisions in the Transportation Code do not form a valid alternative to the Fourth Amendment warrant requirement. To explain why we reject the State's contention that the implied-consent and mandatory-blood-draw provisions establish a constitutionally valid basis for conducting a nonconsensual search in the absence of a search warrant, we review (A) the applicable statutory law and (B) general Fourth Amendment principles, and we then (C) discuss each of the State's particular arguments in turn.

**A. Transportation Code's Implied-Consent and Mandatory-Blood-Draw Provisions**

Because the State relies upon the provisions in the Transportation Code as constituting a valid substitute for a warrant, we begin our analysis with a review of those provisions. The Transportation Code contains a provision establishing implied consent for all drivers arrested on suspicion of DWI. *See* TEX. TRANSP. CODE § 724.011. That provision states,

> If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place . . . the person is deemed to have consented, subject to this chapter, to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance.

*Id*. § 724.011(a).[6] Although this provision appears to create a blanket rule of consent for all individuals arrested for DWI, its terms are further modified by Section 724.013, which establishes a right to refuse to provide a breath or blood sample in routine DWI cases. *See id.* § 724.013. That

---

[6]     *See also* TEX. TRANSP. CODE § 724.012(a) (providing that (a) "[o]ne or more specimens of a person's breath or blood may be taken if the person is arrested and at the request of a peace officer having reasonable grounds to believe the person: (1) while intoxicated was operating a motor vehicle in a public place").

provision, entitled, "Prohibition on Taking Specimen if Person Refuses; Exception," provides that,

"a specimen may not be taken if a person refuses to submit to the taking of a specimen designated

by a peace officer." *Id.* But this right of refusal is not absolute. *See id.* (providing that right of

refusal subject to exceptions "as provided by Section 724.012(b)"). Section 724.012(b), in turn,

establishes that, when certain aggravating factors are present during a DWI stop, a suspect may not

refuse to submit to a specimen and, even if a suspect refuses, an officer is required to obtain a

specimen. *Id.* § 724.012(b). That statute provides,

> (b) A peace officer shall require the taking of a specimen of the person's breath or blood under any of the following circumstances if the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle . . . and the person refuses the officer's request to submit to the taking of a specimen voluntarily:
>
> (1) the person was the operator of a motor vehicle . . . involved in an accident that the officer reasonably believes occurred as a result of the offense and, at the time of the arrest, the officer reasonably believes that as a direct result of the accident:
>
> (A) any individual has died or will die;
>
> (B) an individual other than the person has suffered serious bodily injury; or
>
> (C) an individual other than the person has suffered bodily injury and been transported to a hospital or other medical facility for medical treatment;
>
> (2) the offense for which the officer arrests the person is an offense under Section 49.045, Penal Code [DWI with child passenger]; or
>
> (3) at the time of the arrest, the officer possesses or receives reliable information from a credible source that the person:
>
> (A) has been previously convicted of or placed on community supervision for an offense under Section 49.045 [DWI with child passenger], 49.07 [intoxication assault], or 49.08 [intoxication manslaughter], Penal Code . . . ; or
>
> (B) on two or more occasions, has been previously convicted of or placed on community supervision for an offense under Section 49.04 [misdemeanor DWI], 49.05 [flying while intoxicated], 49.06 [boating while intoxicated], or 49.065

[assembling or operating an amusement ride while intoxicated], Penal Code[.]

*Id*. § 724.012(b). Reading these provisions in conjunction, we observe that they establish a statutory scheme by which an individual who is arrested for an "ordinary" DWI—that is, one that does not fall within any of the enumerated circumstances of Section 724.012(b)—has an absolute right to refuse to provide a specimen, notwithstanding the existence of implied consent. *See id.* §§ 724.011, 724.013; *see also Fienen v. State*, 390 S.W.3d 328, 332 (Tex. Crim. App. 2012) (observing that, notwithstanding existence of implied-consent provision, in ordinary DWI situations, "a person retains an absolute right . . . to refuse a test"). But, if one of the aggravating circumstances described in Section 724.012(b) is present, then, as the State observes, the statutory scheme appears to "extinguish" a suspect's right to refuse to submit a specimen under those specified circumstances. *See id.* § 724.012(b). Stated differently, if one of the aggravating circumstances is present, then, pursuant to the statute, even if a suspect refuses to comply, an officer has a mandatory duty to require that the suspect's blood be drawn. *Id.*

Because the dispute here centers on whether a warrantless, nonconsensual search of a DWI suspect's blood conducted pursuant to Section 724.012(b) complies with the Constitution, we turn to a review of the relevant Fourth Amendment principles.

**B. Fourth Amendment Requirements**

In general, to comply with the Fourth Amendment, a search of a person pursuant to a criminal investigation (1) requires a search warrant or a recognized exception to the warrant requirement, and (2) must be reasonable under the totality of the circumstances. Furthermore, of particular relevance to DWI cases, the Supreme Court has recognized that the Fourth Amendment is implicated in that (3) the collection of a suspect's blood invades a substantial privacy interest, and (4) the exigent

circumstances exception to the search-warrant requirement is not established merely by the natural dissipation of alcohol. We explain each of these requirements in more detail below.

### 1. A Search of a Person Pursuant to a Criminal Investigation Requires a Search Warrant or Recognized Exception to a Warrant

The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The touchstone of the Fourth Amendment is reasonableness. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). The Supreme Court has held that, "'[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant.'" *Id.* (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)); *see also Arizona v. Gant*, 556 U.S. 332, 338 (2009) (describing "basic rule" as being that "'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions'") (citations omitted). The purpose underlying the search-warrant requirement in the context of a criminal investigation is to "ensure[ ] that the inferences to support a search are 'drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" *Riley*, 134 S. Ct. at 2482 (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

Specifically, with respect to searches of people undertaken for the purpose of furthering a criminal investigation, the Supreme Court has determined that, in the absence of a search warrant,

a "search of the person is reasonable only if it falls within a recognized exception" to the warrant requirement. *McNeely*, 133 S. Ct. at 1558; *see also Riley*, 134 S. Ct. at 2482 ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."); *Kentucky v. King*, 563 U.S. ___, 131 S. Ct. 1849, 1856 (2011) (a warrant "must generally be secured," but that requirement is "subject to certain reasonable exceptions"). The recognized exceptions to the warrant requirement that the State suggests are implicated in the present case are the consent exception, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); the automobile exception, *see California v. Acevedo*, 500 U.S. 565, 569 (1991); the search-incident-to-arrest exception, *see Gant*, 556 U.S. at 339; and the special-needs doctrine, *see Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).

### 2. Reasonableness is Judged Under the Totality of Circumstances

"Absent more precise guidance from the founding era, we generally determine whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Riley*, 134 S. Ct. at 2484 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). For the purpose of resolving such questions arising under the Fourth Amendment, we "examine the totality of the circumstances" to determine whether a particular search is reasonable. *Samson v. California*, 547 U.S. 843, 848 (2006); *Brigham City*, 547 U.S. at 406. Given this totality-of-the-circumstances approach, for the most part, "per se rules are inappropriate in the Fourth Amendment context." *United States v. Drayton*, 536 U.S. 194, 201 (2002) (citing *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). As we explain more fully below, in examining the totality of the circumstances applicable to particular cases, the Supreme Court has

approved of warrantless searches that fit within a recognized exception to the search-warrant requirement, or in limited situations involving "special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001).

### 3. Collection of Suspect's Blood Invades a Substantial Privacy Interest – *Schmerber v. California*

In *Schmerber*, the Supreme Court considered for the first time whether a law-enforcement officer may lawfully compel an individual suspected of driving while intoxicated to submit to blood testing. 384 U.S. at 767-69. The Court held that such an intrusion "plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." *Id*. at 767. In describing the privacy interest at stake, the Court took note of "the interest in human dignity and privacy which the Fourth Amendment protects." *Id*. at 770. It further observed that, in light of the fact that search warrants are "ordinarily required for searches of dwellings . . . absent an emergency, no less could be required where intrusions into the human body are concerned." *Id.* The Court stated that the need to secure a warrant from a "neutral and detached magistrate" before permitting a law-enforcement officer to "invade another's body in search of evidence of guilt is indisputable and great." *Id.*

The Court in *Schmerber* nevertheless upheld the warrantless, compelled search of Schmerber's blood as constitutionally permissible on the basis of exigent circumstances. *Id.* at 770-72. Schmerber had been in a car accident and was taken to the hospital. The Court explained that, in light of those factors, the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *Id.* at 770. It further explained that evidence of Schmerber's crime

could have been lost if the officer had been required to seek a warrant to draw Schmerber's blood because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Id.* It added that "[p]articularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." *Id.* at 771. The Court further noted that the blood test "involve[d] virtually no risk, trauma, or pain," and was conducted in a reasonable fashion "by a physician in a hospital environment according to accepted medical practices." *Id.* at 771-72. Thus, after acknowledging the substantial nature of the privacy interest at stake, the Court nevertheless upheld the warrantless search of Schmerber's blood on the basis of the exigent-circumstances exception to the warrant requirement. *Id.*

**4. Exigent Circumstances Not Established By Mere Natural Dissipation of Alcohol –** ***Missouri v. McNeely***

In *McNeely*, the Supreme Court addressed the question whether the natural metabolization of alcohol in the bloodstream presented a per se exigency that, taken on its own, would suffice to justify an exception to the warrant requirement for nonconsensual blood testing in all drunk-driving cases. 133 S. Ct. at 1556. *McNeely* involved an individual who was arrested for DWI and whose blood was drawn over his objection and without a search warrant. Concluding that the natural dissipation of alcohol does not constitute a per se exigency, the Court held that, "consistent with general Fourth Amendment principles, [ ] exigency in this context must be determined case by case based on the totality of the circumstances." *Id.* at 1557; *see also id.* at 1561 (acknowledging that "a significant delay in testing will negatively affect the probative value of the [blood-test] results," but rejecting that fact as basis for departing from the "careful case-by-case assessment of exigency").

Although *McNeely* dealt primarily with exigent circumstances, an exception to the warrant

requirement not at issue in the present case, the opinion nevertheless contains general principles of Fourth Amendment law that apply specifically to the matter of nonconsensual blood draws in the context of a DWI investigation. Of great importance to our resolution of this appeal is the Court's broad recognition that such a warrantless search of a person for the purpose of gathering evidence in a criminal investigation can be justified "only if it falls within a recognized exception" to the warrant requirement, and that "that principle applies to" compulsory blood-specimen collection during a DWI investigation. *Id.* at 1558. The Court further reaffirmed the principle, first established in *Schmerber,* that a "compelled intrusion beneath [the] skin and into [the] veins to obtain a sample of [ ] blood for use in a criminal investigation" constitutes "an invasion of bodily integrity" that implicates "an individual's most personal and deep-rooted expectations of privacy." *Id*. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)).

Having reviewed the relevant statutory law and Fourth Amendment principles, we now turn to a review of the State's arguments as to why it maintains that the statutory provisions in the Transportation Code rendered the Fourth Amendment warrant requirement inapplicable to this case.

**C. Warrantless, Nonconsensual Blood Draw Does Not Fall Within Any of State's Proffered Exceptions to Warrant Requirement**

The State suggests that a search conducted pursuant to the mandatory-blood-draw provisions—specifically, in this case, the provision applicable to repeat DWI offenders—should be upheld as categorically reasonable under (1) the consent exception, applicable in the form of a prior waiver through implied consent, (2) the automobile exception, (3) the special-needs exception, (4) the search-incident-to-arrest exception, or, alternatively, (5) by treating a blood draw as a seizure instead of a search. We consider each of these contentions in turn and, finding them to be without merit, we hold that none of these established exceptions to the warrant requirement categorically

applies to except the warrantless, nonconsensual testing of a suspect's blood pursuant to the provisions in the Transportation Code. We also note briefly here that, because the facts are undisputed and the questions before us are matters of law, we apply a *de novo* standard of review. *See Matthews v. State*, 431 S.W.3d 596, 607 (Tex. Crim. App. 2014); *Arguellez v. State*, 409 S.W.3d 657, 663 (Tex. Crim. App. 2013).

**(1) Consent in the Form of a Prior Waiver**

Before addressing the merits of the State's argument regarding implied consent, we first briefly explain why we agree with the State's contention that the court of appeals erred by determining that it forfeited its right to rely on implied consent as a valid basis for upholding the search in this case. We then explain why we disagree with the State as to the merits of its arguments that this search may be upheld under the consent exception to the warrant requirement on the basis of a defendant's irrevocable "prior waiver" of his Fourth Amendment rights.

**a.   The State Did Not Forfeit Its Right to Rely on Consent in the Form of Waiver**

In its second ground in its petition for discretionary review, the State challenges the court of appeals's determination that the State's stipulation that there was "no consent" to the blood draw amounted to a waiver of its "implied consent" or "deemed consent" argument based on the provisions in the Transportation Code. *See Villarreal*, 2014 WL 1257150, at *11. At the hearing on the motion to suppress, the parties stipulated that Villarreal's "blood was drawn without his consent and without a warrant." It is clear from Villarreal's motion to suppress and the evidence and arguments presented at the hearing that the parties' intent was to stipulate that Villarreal's blood was drawn in spite of his refusal to provide a specimen and in the absence of a warrant. The parties thus stipulated to the factual matter of Villarreal's refusal, but such a stipulation does not foreclose the

State from raising a particular legal argument on appeal. Furthermore, at all times, the record indicates that the parties understood the dispute in this case to be narrowly based on the legal question of whether the State could properly rely on the provisions in the Transportation Code, including the implied-consent statute, as an alternative to a search warrant. We, therefore, agree with the State's assertion that the court of appeals incorrectly determined that the State forfeited its implied-consent argument on appeal. We, however, need not remand the case to the court of appeals for further consideration of this argument because, despite initially stating that the State had forfeited this argument on appeal, the court of appeals then went on to discuss and disapprove of the State's contention that implied consent could form a valid basis for upholding the search in this case. Because the court of appeals reviewed and rejected the State's argument that implied consent could serve as a valid basis for upholding the warrantless search in this case, we may properly review the court's resolution of that legal question. *See* TEX. R. APP. P. 66.3 (providing for this Court's review of decisions of courts of appeals).

### b. Implied Consent that Has Been Withdrawn Is Not Voluntary Consent

Although it recognizes that a waiver of Fourth Amendment rights through consent to search must ordinarily be carefully scrutinized for its free and voluntary character,[7] the State asserts that those principles are inapplicable to the present situation. Instead, it asserts that a "parallel exception" applies when a defendant has previously waived his Fourth Amendment rights in exchange for receiving some benefit or privilege from the State. Suggesting that this prior-waiver principle applies to the present circumstances, it asserts that an individual suspected of DWI "accept[s] a

---

[7]      *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2001).

license to drive and such acceptance may carry with it an obligation to allow statutorily authorized inspections of that activity that would otherwise require a warrant." On this basis, the State urges this Court to hold that, in light of the existence of the implied-consent and mandatory-blood-draw provisions, a driver "impliedly agrees ahead of time that, in exchange for the privilege of driving on our roads, he is willing to waive the right to a warrant in these limited circumstances. The deal is sealed when he gets behind the wheel, and it can't later be revoked when he gets caught driving in an impaired condition."

Although we acknowledge that Fourth Amendment rights "may be waived," *Zap v. United States*, 328 U.S. 624, 628 (1946), we find that principle to be inapplicable here. As the State acknowledges, to constitute a valid waiver of Fourth Amendment rights through consent, a suspect's consent to search must be freely and voluntarily given. *Schneckloth*, 412 U.S. at 227 (observing that consent must be voluntarily given in that it was not "coerced by threats or force, or granted only in submission to a claim of lawful authority"); *see also Bumper*, 391 U.S. at 548 (observing that consent must be "freely and voluntarily given"). An additional necessary element of valid consent is the ability to limit or revoke it. *See Florida v. Jimeno*, 500 U.S. 248, 252 (1991) (suspect may "delimit as he chooses the scope of the search to which he consents"); *Miller v. State*, 393 S.W.3d 255, 266 (Tex. Crim. App. 2012) (stating that it is "undisputed" that consent "may be limited or revoked"). The matter of whether consent is voluntary is a "question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. It would be wholly inconsistent with these principles to uphold the warrantless search of a suspect's blood on the basis of consent when a suspect has, as in the present case, expressly and unequivocally refused to submit to the search. That explicit refusal to submit to blood testing overrides the existence of any implied

consent, and, unless some other justification for the search applies, there remains no valid basis for conducting a warrantless search under those circumstances. *See Bumper*, 391 U.S. at 548-49 (explaining that a showing of "no more than acquiescence to a claim of lawful authority" cannot constitute valid consent). To the extent the State suggests that the implied-consent and mandatory-blood-draw provisions in the Transportation Code categorically extinguish a DWI suspect's right to withdraw consent when some aggravating circumstance is present, that suggestion cannot be squared with the requirement that, to be valid for Fourth Amendment purposes, consent must be freely and voluntarily given based on the totality of the circumstances, and must not have been revoked or withdrawn at the time of the search. *Compare* TEX. TRANSP. CODE §§ 724.011, 724.012(b), *with Schneckloth*, 412 U.S. at 227, *and Jimeno*, 500 U.S. at 252. In other words, implied consent that has been withdrawn or revoked by a suspect cannot serve as a substitute for the free and voluntary consent that the Fourth Amendment requires.

### c. Prior Waiver of Fourth Amendment Rights in Other Contexts Inapplicable to Criminal Suspects

Recognizing this apparent inconsistency between Texas's implied-consent law and the requirements for establishing voluntary consent under the Fourth Amendment, the State forgoes urging us to directly hold that implied consent that has been revoked by a suspect can nevertheless supply the type of "bare consent" needed to overcome the warrant requirement. Instead, it urges us to hold that a driver who accepts the privilege of driving on Texas roadways has, by virtue of his enjoyment of that privilege, lost the right to later revoke the implied consent supplied by the Transportation Code or to complain about the absence of a warrant. Although the State suggests that the Supreme Court has "long recognized" that a prior waiver can serve as a "parallel exception" to the consent exception when the suspect has received some benefit or privilege in exchange for his

waiver of constitutional rights, we are aware of no Supreme Court cases approving of this doctrine's applicability in a context similar to the one with which we are confronted today, which is a bodily search of an individual suspected of criminal wrongdoing. Furthermore, we find that the cases relied upon by the State to establish this "parallel exception" are distinguishable because they are limited to (i) the federal-regulatory context, (ii) the context of parolees and probationers, or (iii) the non-criminal context, none of which are implicated here.

### i. Exceptions Applicable to Federal-Regulatory Context Are Not Analogous

In asserting that such a parallel exception to the consent exception should be applied here, the State relies primarily on *Zap*, 328 U.S. at 627. But that case is distinguishable on its facts. *Zap* involved the warrantless search of the accounting records of a United States Navy contractor who had expressly agreed by the terms of his contract to permit such inspections, which were authorized by federal regulation. *Id.* The Supreme Court upheld the warrantless search as permissible under the Fourth Amendment, observing that Zap, "in order to obtain the government's business, specifically agreed to permit inspection" of his records, thereby waiving any claim to privacy in those records which he otherwise might have had. *Id.* at 628. Thus, the Court's holding in *Zap* was primarily focused on the existence of a "contractual agreement for inspection" of business records and on the fact that Zap had knowingly waived his rights pursuant to a "business undertaking for the government." *Id*. at 629-30. *Zap* is thus properly understood as indicating that, where an individual makes an express contractual waiver of his privacy rights in exchange for the opportunity to do business with the federal government, such a waiver may constitute valid prior consent to search a business premises within the meaning of the Fourth Amendment. *See id.* It does not, as the State suggests, more generally stand for the proposition that the government may exact from a citizen a

generalized and irrevocable waiver of Fourth Amendment rights in exchange for the enjoyment of everyday privileges, such as driving on the State's roadways. Nor does it suggest that such a waiver would be valid if the waiving party were actually unaware that he was giving up his rights in exchange for some privilege. Furthermore, we note that the search in *Zap* was a search of "accounts and records" and was not a bodily search, which necessarily implicates a greater and more personal privacy interest than the interest one has in his business dealings. *See id.* at 628.

Similarly, although the State contends that the Supreme Court's opinion in *United States v. Biswell* establishes that "acceptance of a license to engage in a pervasively regulated activity may carry with it an obligation to allow statutorily authorized inspection of that activity that would otherwise require a warrant," we do not read *Biswell* so broadly. *See* 406 U.S. 311, 311-12 (1972). In that case, the Court upheld the warrantless search of the business premises of a federally licensed firearms dealer pursuant to a federal statute authorizing such searches. *Id.* at 317.[8] But the Court in that case emphasized that its analysis was rooted in "the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope." *Id.* at 315. Because Biswell chose "to engage in this pervasively regulated business and to accept a federal license, he [did] so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." *Id.* at 317. The Court further noted that Biswell had received a compilation of all the statutes governing his obligations and defining the inspector's authority to search, thus putting him on actual notice of his obligations. *Id.* The Court's upholding of the warrantless search in *Biswell*

---

[8] The regulation at issue in *Biswell* authorized official entry during business hours into the premises "of any firearms or ammunition . . . dealer . . . for the purpose of inspecting or examining (1) any records or documents required to be kept . . . and (2) any firearms or ammunition kept or stored" on the premises. *United States v. Biswell*, 406 U.S. 311, 311-12 (1972) (citing 18 U.S.C. § 923(g)).

is properly understood as creating a limited exception to the warrant requirement that applies to searches of business premises in historically "pervasively regulated industries," for which the "threat to privacy [is] not of impressive dimensions[.]" *Id.* at 316; *see also New York v. Burger*, 482 U.S. 691, 699 (1987) (explaining that the "expectation of privacy in commercial premises" is significantly less than the "expectation in an individual's home"). We, therefore, disagree with the State's suggestion that the meaning of *Biswell* can be expanded to apply to a bodily search of a driver, simply by virtue of his acceptance of a driver's license and mere constructive knowledge, at most, of the terms of the mandatory-blood-draw statutes. The State's general assertion that engaging in any regulated activity subject to licensing and inspection requirements, even non-commercial ones, subjects participants to an irrevocable implied waiver of Fourth Amendment rights to privacy in their bodies while participating in that activity, is thus without support.

### ii. Exceptions Applicable to Parolees and Probationers Are Not Analogous

The State cites two cases that it suggests establish that "[g]overnmental and quasi-governmental bodies often condition the granting of a privilege upon the waiver of certain constitutional rights." *See United States v. Knights*, 534 U.S. 112, 116 (2001); *Samson*, 547 U.S. at 852. *Knights* and *Samson* both dealt with warrantless searches of individuals who were on parole or probation. *Knights*, 534 U.S. at 114; *Samson*, 547 U.S. at 846. The defendants in both of those cases had been required by the conditions of their release to expressly waive in writing their Fourth Amendment rights in exchange for avoiding prison time. *See Knights*, 534 U.S. at 116; *Samson*, 547 U.S. at 852. These cases, however, do not stand for the proposition that the government may condition the granting of a privilege upon the waiver of a constitutional right, but instead are instructive in applying a general Fourth Amendment balancing test that applies in limited contexts,

as we discuss later in this opinion. The Supreme Court expressly stated in *Knights* and *Samson* that it was not resting its holding in those cases on a consent rationale, but rather was applying a general Fourth Amendment balancing test. *See Knights*, 534 U.S. at 118 (stating that rationale for upholding search was not based solely on prior waiver of rights, but was rather rooted in the basis that the search was "reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances,'" including Knights's "signficantly diminished" expectation of privacy) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)); *Samson,* 547 U.S. at 853 n. 3 (stating that holding was based on "general Fourth Amendment" totality-of-the-circumstances analysis, thereby avoiding the question "whether acceptance of the search condition constituted consent in the *Schneckloth* sense of a complete waiver of Fourth Amendment Rights"; "we decline to rest our holding today on the consent rationale"). Although the State contends otherwise, *Samson* and *Knights* cannot stand for the proposition that the Supreme Court has broadly recognized that acceptance of a condition or privilege from the government generally constitutes a valid basis for finding an advance irrevocable waiver of Fourth Amendment rights. Furthermore, even if the consent exception had been the basis for the holdings in *Samson* and *Knights*, we observe that the individuals in those cases had waived their Fourth Amendment rights expressly and knowingly. *See Knights*, 534 U.S. at 114 (observing that the defendant in that case had expressly agreed in writing that he would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant"); *Samson*, 547 U.S. at 846, 852 (observing that California parolees must "agree in writing to be subject to search or seizure . . . at any time of the day or night, with or without a search warrant"). The situation in those cases is further distinguishable from the situation presently before this Court, which involves an implied waiver of

Fourth Amendment rights pursuant to a statutory scheme that does not expressly address the warrant requirement. *See* TEX. TRANSP. CODE §§ 724.011(a), 724.012(b), 724.013.

### iii. Exceptions Applicable to Drug Testing of Public-School Students Are Not Analogous

The State also refers to *Board of Education v. Earls* to support its suggestion that the government may condition the granting of a privilege upon the waiver of certain constitutional rights. *Bd. of Educ. v. Earls*, 536 U.S. 822, 825 (2002). For similar reasons as those explained above, we find inapplicable the holding of *Earls*, which upheld warrantless drug testing of public-school students engaged in extracurricular activities under the special-needs exception to the warrant requirement. *See id*. In *Earls*, the Court expressly limited the reasoning of that case to the context of "administrative searches" undertaken for purposes "not in any way related to the conduct of criminal investigations." *See id.* at 828 (observing that, although "[i]n the criminal context, reasonableness usually requires a showing of probable cause[,]" the probable-cause standard is "peculiarly related to criminal investigations and may be unsuited to determining the reasonableness of administrative searches" where the government seeks to prevent the development of hazardous conditions). It further based its holding in that case on the existence of schools' "custodial and tutelary responsibility for children," the minimally invasive nature of urinalysis, and students' limited privacy interest in a public-school environment. *Id.* at 830. Because the situation in the present case is not an administrative search but instead implicates the investigation of criminal conduct, the holding and reasoning in *Earls* are clearly inapplicable.

### d. Other Courts Have Rejected The Proposition that a DWI Suspect Waives His Fourth Amendment Rights Through Implied Consent

In addition to finding that the cases cited by the State fail to establish the broad proposition upon which it seeks to rely, we further note that courts in several other jurisdictions have recently

considered challenges to statutes that aim to establish irrevocable implied consent and have

concluded that those statutes, when used to draw a suspect's blood without a warrant and over his

objection, do not establish valid legal consent within the bounds of the Fourth Amendment. *See,*

*e.g., State v. Wulff*, ___P.3d___, No. 41179, 2014 WL 5462564 (Idaho Oct. 29, 2014) (holding that

Idaho statute establishing irrevocable implied consent for all drivers suspected of DWI "does not fall

under the consent exception to the Fourth Amendment of the United States Constitution");[9] *Byars*

*v. State*, __ P.3d ___, No. 61348, 2014 WL 5305892, at \*12 (Nev. Oct. 16, 2014) (slip. op.)

(rejecting State's argument that search was reasonable based on irrevocable consent provided by

implied-consent statute);[10] *State v. Wells*, No. 172013-01145-CCA, 2014 WL 4977356, at \*13 (Tenn.

---

[9]     The Idaho statute at issue in *Wulff* provided that a person gives implied consent to evidentiary testing, including a blood draw, when a person drives on Idaho's roads and a police officer has reasonable grounds to believe that the person has committed the offense of DWI. *State v. Wulff*, No. 41179, 2014 WL 5462564 (Idaho Oct. 29, 2014) (citing IDAHO CODE § 18-8002).

[10]     The Nevada Supreme Court described Nevada's mandatory blood-draw law that, like Texas's law, requires involuntary blood draws based on probable cause, but unlike Texas's law, is not limited to third-offender DWIs, stating,

> According to the State, even though Byars refused to submit to the blood draw, he had consented to it by choosing to drive on Nevada roads. NRS 484C.160(1) provides that "any person who drives or is in actual physical control of a vehicle on a highway or on premises to which the public has access shall be deemed to have given his or her consent to an evidentiary test of his or her blood, urine, breath or other bodily substance" if a police officer has reasonable grounds to believe that the person was driving or in actual physical control of a vehicle while under the influence of alcohol or a controlled substance or was engaging in other conduct prohibited by certain statutes. If a driver does not submit to a test and the police officer has reasonable grounds to believe that the person was under the influence of alcohol or a controlled substance or engaging in other specified conduct, "the officer may direct that reasonable force be used to the extent necessary to obtain samples of blood from the person tested."

*Byars v. State*, __ P.3d ___, No. 61348, 2014 WL 5305892, at \*12 (Nev. Oct. 16, 2014) (slip. op.).

(continued...)

Crim. App. Oct. 6, 2014) (slip. op.) (holding that "the privilege of driving does not alone create consent for a forcible blood draw"; such a search is "not reasonable unless performed pursuant to a warrant or to an exception to the warrant requirement"; "[t]he implied consent law does not, in itself, create such an exception");[11] *State v. Fierro*, 853 N.W.2d 235, 237 (S.D. 2014) (implied-consent statute did not constitute stand-alone exception to warrant requirement); *State v. Butler*, 302 P.3d 609, 613 (Ariz. 2013) (holding that, independent of implied-consent statute, Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw). Furthermore, we observe that almost all of the Texas courts of appeals that have considered such challenges to Texas's statutory scheme have reached that same conclusion.[12]

In *Byars*, the Nevada Supreme Court rejected the State's argument "that consent is valid based solely on [the defendant's] decision to drive on Nevada's roads," describing that argument as

---

[10](...continued)
Notably, the court concluded that it had "found no jurisdiction that has upheld an implied consent statute that allows an officer to use force to obtain a blood sample upon the driver's refusal to submit to a test." *Id*.

[11]    The Tennessee Court of Criminal Appeals described that state's implied-consent law, which permits a nonconsensual blood draw when "law enforcement has 'reasonable grounds to believe' that the person was driving under the influence or had committed vehicular assault, vehicular homicide, or aggravated vehicular homicide as a proximate result of intoxication." *State v. Wells*, No. 172013-01145-CCA, 2014 WL 4977356, at *13 (Tenn. Crim. App. Oct. 6, 2014) (slip. op.) (citing T.C.A. § 55-10-406(a)(1) (2012)). Tennessee's implied-consent law is similar to Texas's law in that it permits a nonconsensual blood draw when there is probable cause to believe that some aggravating circumstance is present, such as the fact that the intoxicated driver has caused another person bodily injury or death. *Compare id*. to TEX. TRANSP. CODE § 724.011(b).

[12]    *See, e.g., State v. Anderson*, ___ S.W.3d ___, No. 09-13-00400-CR, 2014 WL 5033262 (Tex. App.—Beaumont Oct. 8, 2014) (concluding that Section 724.012(b) "does not constitute an exception to the Fourth Amendment's warrant requirement"); *Aviles v. State*, ___ S.W.3d __, No. 04-11-00877-CR, 2014 WL 3843756 (Tex. App.—San Antonio Aug. 6, 2014) (op. on remand) (same); *Forsyth v. State*, 438 S.W.3d 216 (Tex. App.—Eastland 2014) (holding that implied consent under Transportation Code not equivalent to voluntary consent for Fourth Amendment purposes).

"problematic because the statute makes the consent irrevocable." 2014 WL 5305892, at *4-5. And in *Wulff*, the Idaho Supreme Court held that, after *McNeely*, that state's implied-consent statute was not an "acceptable" basis for conducting warrantless blood draws under the consent exception because the statute "operate[d] as a per se exception to the warrant requirement," for which the Supreme Court had "repeatedly expressed disapproval" in *McNeely*. *See Wulff*, 2014 WL 5462564, at *5. The *Wulff* court observed that whether consent is valid is a determination to be made based on the totality of the circumstances and, as such, "[a] holding that the consent implied by statute is irrevocable would be utterly inconsistent with the language in *McNeely* denouncing categorical rules that allow warrantless forced blood draws." *Id.* at *5, 7. We agree with these courts' assessments that, in the context of a nonconsensual, warrantless bodily search of a person suspected of criminal activity, a statute providing for irrevocable implied consent cannot supply the type of voluntary consent necessary to establish an exception to the Fourth Amendment warrant requirement. We reject the State's argument that a suspect can be held to have validly and irrevocably waived his Fourth Amendment rights in advance of a search through the existence of implied consent on the sole basis of his receipt of the privilege of driving on Texas roadways.

### 2. Automobile Exception Is Inapplicable

With respect to the State's assertion that the warrantless search of a DWI suspect's blood should be upheld under the automobile exception, we reject that suggestion outright because the automobile exception has been expressly limited to the vehicular-search context. *See, e.g., Acevedo*, 500 U.S. at 580. It cannot be expanded to encompass a bodily search in the form of a compulsory blood draw of an individual. *See Houghton*, 526 U.S. at 303; *United States v. Di Re*, 332 U.S. 581, 587 (1948). Furthermore, although the State appears to contend that a driver's privacy interest in

his blood is, similar to his interest in an automobile, minimal under these circumstances in light of the existence of implied consent and the highly regulated nature of driving, we similarly disagree with that contention because it is inconsistent with the Supreme Court's description of the substantial privacy interests at stake here. *See McNeely*, 133 S. Ct. at 1565 ("But the fact that people are 'accorded less privacy in . . . automobiles because of th[e] compelling governmental need for regulation,' does not diminish a motorist's privacy interest in preventing an agent of the government from piercing his skin.") (quoting *California v. Carney*, 471 U.S. 386, 392 (1985)). We thus decline to expand the automobile exception to apply to a bodily search of a driver suspected of DWI.

### 3. Special Needs Exception is Inapplicable

Regarding the State's suggestion that this type of search may be upheld under the special-needs doctrine, we find that argument similarly unconvincing. As described above, the special-needs doctrine is limited to situations involving "special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin*, 483 U.S. at 873-74; *see also King*, 133 S. Ct. at 1978 (describing special-needs doctrine as encompassing "programmatic searches of either the public at large or a particular class of regulated but otherwise law-abiding citizens"). In those limited situations, the need for a warrant is diminished because "the public interest is such that neither a warrant nor probable cause is required, or because an individual is already on notice, for instance because of his employment, or the conditions of his release from government custody, that some reasonable police intrusion on his privacy is to be expected." *King*, 133 S. Ct. at 1958.

Furthermore, the special-needs doctrine creates an exception to the warrant requirement only in situations in which the existence of special needs makes obtaining a warrant impracticable. *See*

*Griffin*, 483 U.S. at 873 (describing exception as applying when special needs beyond the normal need for law enforcement "'make the warrant and probable-cause requirement impracticable'"). The doctrine has thus been applied in the context of, among others, the need to deter drug use in public schools through compulsory drug testing of students participating in school-sponsored athletics programs, *Vernonia*, 515 U.S. at 653, and in the context of the need to assure that railroad employees engaged in train operations are not under the influence of drugs or alcohol, *Skinner*, 489 U.S. at 623. In both of those situations, the Court's holdings were once again rooted in the particular context of those cases. In *Vernonia*, the Court observed that "Fourth Amendment rights . . . are different in public schools than elsewhere" in light of schools' responsibility to ensure the safety and welfare of students, and students accordingly have a lesser expectation of privacy than members of the population generally. *Vernonia*, 515 U.S. at 656. And in *Skinner*, the Court stated that the privacy interest at stake in that case was "minimal," that railway employees have long been subject to a reduced expectation of privacy in light of the historically pervasive regulation of that industry, and that the "governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion." *Skinner*, 489 U.S. at 627.

Here, we see no basis for holding that the government's need to conduct searches of DWI suspects' blood constitutes a "special need" that would permit a departure from the probable-cause and warrant requirement. The need here does not go "beyond the normal need for law enforcement," nor does it "make the warrant and probable-cause requirement impracticable." *Griffin*, 483 U.S. at 873. Furthermore, the Supreme Court has suggested that the special-needs doctrine is inapplicable when the primary purpose of a search is to generate evidence for law-enforcement purposes. *See Ferguson v. City of Charleston*, 532 U.S. 67, 83 (2001) (invalidating public hospital's policy of

conducting nonconsensual testing of pregnant women for illicit drug use because "the immediate objective of the searches was to generate evidence for law enforcement purposes"; given that fact, the case "simply does not fit within the closely guarded category of 'special needs'"); *see also Skinner*, 489 U.S. at 620-21 (upholding warrantless drug testing of railroad employees in part because testing was "not to assist in the prosecution of employees, but rather to prevent accidents and casualties in railroad operations") (citations omitted).

In *Ferguson*, the Supreme Court observed that it had never applied the special-needs doctrine in the context of a search undertaken for the purpose of gathering evidence for use in a criminal investigation. *Ferguson*, 532 U.S. at 83 n. 20 ("In none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes."). Furthermore, in light of the investigatory purpose underlying the searches in *Ferguson*, the Court explained that it would apply the normal Fourth Amendment framework that requires a warrant or an applicable exception, as opposed to a balancing-of-interests test. *Id.* at 85-86. It explained, "The fact that positive test results were turned over to the police does not merely provide a basis for distinguishing our prior cases applying the 'special needs' balancing approach to the determination of drug use. It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment." *Id.* at 84. Public-hospital employees who undertake to obtain evidence of criminal conduct "for the specific purpose" of incriminating patients, it observed, "have a special obligation to make sure that the patients are fully informed about their constitutional rights, as standards of knowing waiver require." *Id.* at 85. The Court further explained that to hold otherwise would mean that "any search to generate evidence for use by the police in enforcing general criminal laws would be justified by reference to the broad social benefits that those laws might bring about (or, put another way, the

social harms that they might prevent)." *Id.* at 84 n. 22. Such an approach, it stated, would be "inconsistent with the Fourth Amendment." *Id.* at 84.

In light of these principles, we conclude that the special-needs doctrine is inapplicable in the present context, when the search of a DWI suspect's blood is undertaken by law-enforcement officers for the primary purpose of generating evidence to be used in a criminal prosecution. *See id.* at 81 (rejecting applicability of special needs when purpose "actually served" by search "'is ultimately indistinguishable from the general interest in crime control'") (citing *Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)). We further note that at least one other court has concluded that the special-needs doctrine is inapplicable in the context of a mandatory blood draw of a DWI suspect where the "primary purpose of the warrantless seizure of [a defendant's] blood was evidentiary and prosecutorial." *Fierro*, 853 N.W.2d at 242-43. We similarly decline to hold that special needs applies in this context, and we reject the State's contention that the mandatory, nonconsensual blood draw in this case may be upheld under a special-needs balancing test.

### 4. Search Incident to Arrest Is Inapplicable

With respect to the suggestion that a warrantless blood draw constitutes a search incident to arrest, we also reject that contention because that exception to the warrant requirement applies only if such a search is "substantially contemporaneous" with the arrest and is confined to the area within the immediate control of the arrestee. *State v. Granville*, 423 S.W.3d 399, 410 (Tex. Crim. App. 2014) (citing *Vale v. Louisiana*, 399 U.S. 30, 33 (1970)). The justification for permitting such a warrantless search is (1) the need for officers to seize weapons or other things which might be used to assault an officer or effect an escape, and (2) the need to prevent the loss or destruction of evidence. *Id.* at 410 (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973); *Chimel v.*

*California*, 395 U.S. 752, 762-63 (1969)). "Thus, a search incident to arrest cannot normally be justified if the 'search is remote in time or place from the arrest . . . or no exigency exists.'" *Id.* (quoting *United States v. Chadwick*, 433 U.S. 1, 15 (1977)). Although the State contends that the dissipation of alcohol in the bloodstream constitutes a "recognized exigency" that would justify applying the search-incident-to-arrest exception here, we find that argument to essentially propose adoption of a per se exigency rule that was expressly disavowed by *McNeely*. 133 S. Ct. at 1568. Furthermore, in situations involving the possible destruction of evidence, the Supreme Court has suggested that the search-incident-to-arrest exception is most commonly applied to an "active attempt by a defendant or his associates to conceal or destroy evidence upon arrest." *Riley*, 134 S. Ct. at 2473. Given that alcohol in the bloodstream dissipates at a predictable rate and is encased within a defendant's veins, there is no possibility of that evidence being subject to sudden destruction or disappearance as a result of any active efforts by a defendant. Based on these considerations, we conclude that the search-incident-to-arrest exception is inapplicable.

### 5. Blood Draw Is Not Merely a Seizure

We briefly take note of the State's related argument that the drawing of a DWI suspect's blood constitutes a seizure, which "generally does not require a warrant," as opposed to a search. We summarily reject this argument because it is foreclosed by Supreme Court precedent that has repeatedly described any bodily intrusion as constituting a search for which either a warrant or an applicable exception is required. *See, e.g.*, *King*, 133 S. Ct. at 1980 (using buccal swab on inner tissues of a person's cheek in order to obtain DNA samples is a search); *McNeely*, 133 S. Ct. at 1556; *Schmerber*, 384 U.S. at 770 (virtually any intrusion "into the human body" constitutes search); *Skinner*, 489 U.S. at 616 (breathalyzer test, which requires "deep lung" breath for chemical analysis,

constitutes a search). We decline to depart from the longstanding principle that the drawing of a suspect's blood constitutes a search within the meaning of the Fourth Amendment.

For all of the foregoing reasons, we conclude that the warrantless, nonconsensual testing of a DWI suspect's blood cannot be justified as a reasonable intrusion under any of the State's proffered exceptions to the warrant requirement.

### D. Search May Not Be Upheld Under General Fourth Amendment Balancing Test

As an alternative to a finding that warrantless, nonconsensual blood testing under the provisions in the Transportation Code falls within a recognized exception to the warrant requirement, the State urges us to hold that such a search may be upheld on the basis that it is reasonable under a general Fourth Amendment balancing test. That test, which is rooted in "traditional standards of reasonableness," requires a court to weigh "'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.'" *King*, 133 S. Ct. at 1970 (quoting *Houghton*, 526 U.S. at 300). In some circumstances, such as "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *McArthur*, 531 U.S. at 330. In support of its argument that such a balancing test is applicable here, the State suggests that "several related justifications," which "balance the need to rid public roads of drunk drivers against the lessened expectation of privacy that impaired drivers have concerning the drawing of a sample of their blood," suffice to establish an exception to the warrant requirement under the "narrowly specified circumstances" in the statute. Specifically, it urges us to weigh the government's legitimate interest in curbing drunk driving; the gravity of the offense; the desirability of a bright-line rule; the presumption of validity and

constitutionality that attaches to legislative enactments; the reduced expectation of privacy of a DWI suspect who has been arrested; and the minimal nature of the intrusion.

Although we agree with the State's contention that the government has a substantial interest in preventing drunk driving, we disagree that a balancing test is appropriate given the context. The Supreme Court has made clear that, in the context of an active criminal investigation, and when the primary goal of law-enforcement activity is the gathering of evidence, a warrantless search of a person is unreasonable unless it falls within an established exception to the warrant requirement. *See McNeely*, 133 S. Ct. at 1558 (warrantless search of the person is reasonable only if it falls within a recognized exception); *Riley*, 134 S. Ct. at 2482 ("[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant"; "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement"); *Skinner*, 489 U.S. at 619 (in "most criminal cases, we strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment"; "[e]xcept in certain well-defined circumstances, a search or seizure in [a criminal] case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause"). We decline to disregard this well-established principle in favor of a more generalized balancing-of-interests test.

In seeking to establish the viability of a balancing test here, the State relies primarily upon the standard set forth in *Maryland v. King*, in which the Supreme Court upheld the warrantless collection of DNA from felony arrestees as part of a routine booking procedure for serious offenses. *King*, 133 S. Ct. at 1970. In upholding the search in *King*, the Supreme Court took into consideration the limited circumstances under which arrestees' DNA would be collected and utilized.

*Id.* at 1966-68.[13] It emphasized that the collection of DNA from arrestees was reasonable in light of the fact that the "arrestee is already in valid police custody for a serious offense supported by probable cause." *Id.* at 1970. Furthermore, it observed that the mandatory "DNA collection is not subject to the judgment of officers whose perspective might be colored by their primary involvement in the often competitive enterprise of ferreting out crime," and it took note of the standardized nature of the tests and the regulations that authorized them. *Id.* The Court went on to observe that the purpose of the DNA collection was to allow law enforcement officers, "in a safe and accurate way[,] to process and identify the person and possessions they must take into custody." *Id*. Such procedures were thus justified as reasonable, in large part, because they were not based upon an individualized suspicion of criminal wrongdoing, which would trigger the need for the interposition of a neutral magistrate between the citizen and the law enforcement officer, but rather were part of the routine administrative procedures at the police station that guaranteed law enforcement's ability to identify and keep track of arrestees. *See id.* at 1977 ("In the balance of reasonableness required by the Fourth Amendment, therefore, the Court must give great weight both to the significant government interest at stake in the identification of arrestees and to the unmatched potential of DNA identification to serve that interest.").

With respect to the governmental interest at stake, the *King* Court went to great lengths to clarify that the DNA information being collected from arrestees was not for the primary purpose of

---

[13]    The Court observed that a DNA sample would be collected only from an individual charged with a crime of violence or burglary; that the sample would not be processed or placed in a database until the individual had been arraigned and a judicial officer had verified that there was probable cause to detain him; and that samples would be immediately destroyed if a judicial officer determined that there was no probable cause to detain the arrestee for the qualifying offense or if the arrest ultimately did not result in a conviction. *Maryland v. King*, 133 S. Ct. 1958, 1967 (2013).

gathering evidence against them, but rather was for the purpose of routine identification of inmates. *Id.* at 1971, 1977-78 (discussing government's "legitimate interest" in identifying inmates and stating that DNA collection "is no more than an extension of methods of identification long used in dealing with persons under arrest"). And, although four dissenters disagreed with that assessment, that fact formed the basis for the Court's departure from the normal warrant requirement in that case. *See id.* at 1980. Unlike *King*, where police used no discretion in the application of the routine-identification process, the primary purpose of the search in the present case is for investigation of a crime based on a discretionary determination by a law-enforcement officer that there is probable cause of intoxication. *See id.* at 1969-1970 ("The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the 'interpo[lation of] a neutral magistrate between the citizen and the law enforcement officer.'") (quoting *Treasury Employees v. Von Raab*, 489 U.S. 656, 667 (1989)). We decline to hold that the balancing approach taken in *King* is appropriate in this context.[14]

We further observe that, with respect to the privacy interest at stake, the *King* Court noted that a detainee has a "reduced expectation of privacy" and would be subjected to only a "minimal intrusion[ ]" in the form of a mouth buccal swab. *Id.* at 1978. But it further sought to establish that

---

[14]     We note that one author has recently interpreted *King* as being "broadly consistent with" and leaving "intact" the traditional Fourth Amendment framework that requires either a search warrant or the applicability of an established exception to the warrant requirement. *See* David H. Kaye, *Why So Contrived? Fourth Amendment Balancing, Per Se Rules, and DNA Databases After Maryland v. King*, 104 J. Crim. L. & Criminology 535, 564 (2014). Kaye observes that *King* "does not liberate courts to weigh interests *ab initio* in light of the totality of the circumstances in every case," nor does it empower courts to consider, for example, "the nature of the specific crime [law enforcement] are seeking to solve in deciding whether a particular warrantless search . . . is constitutional." *Id.* at 564 n. 167. Kaye further notes that, "[h]ad the majority wished to discard the [traditional] framework in this wholesale manner, it would not have needed to cobble together a set of purely detention-related state interests." *Id.*

all searches are not acceptable "solely because a person is in custody." *Id.* at 1979. In situations involving weightier privacy concerns or greater intrusions, it acknowledged that such a search may nevertheless require a warrant. *Id.* (observing that where "privacy-related concerns are weighty enough," search "may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee").

Although the State contends that *King* broadly permits a reviewing court to conduct a weighing of competing interests for the purpose of determining the reasonableness of an investigative search, we disagree with this broad reading of *King*. The DNA search at issue in *King* involved the minimally intrusive, non-discretionary search of individuals who were already being subjected to routine booking procedures. In light of that fact, the Court concluded that "the additional intrusion upon the arrestee's privacy" beyond the already intrusive nature of other booking procedures was minimal. *Id.* at 1976, 1978. By contrast, here, puncturing the skin constitutes a substantial intrusion beyond what a DWI arrestee would otherwise experience. And the *King* Court recognized that a buccal swab is a "far more gentle process" than venipuncture to draw blood. *Id.* at 1968.

Moreover, even if we were to accept the viability of a Fourth Amendment balancing test here as a substitute for the established exceptions to the warrant requirement, we would conclude that, on balance, a DWI suspect's privacy interest outweighs the State's interest in preventing drunk driving through warrantless searches. *McNeely* reaffirmed the principle that a compelled physical intrusion beneath the skin to obtain evidence in a criminal investigation implicates significant privacy interests, and this privacy interest is not automatically diminished simply because an individual is suspected of a serious DWI offense. *McNeely*, 133 S. Ct. at 1558. *McNeely* further

rejected the government's interest in curbing drunk driving as a valid basis for departing from the traditional exceptions to the warrant requirement, stating that "the general importance of the government's interest in this area does not justify departing from the warrant requirement without a showing" that some established exception, such as exigency, applies. *Id.* at 1565. And, although we acknowledge the magnitude of the drunk driving problem in Texas and the government's legitimate and substantial interest in curbing that problem, we see no compelling need on the part of law enforcement to undertake to solve this problem through warrantless, nonconsensual searches of suspects' blood. This is particularly so in light of the fact that warrants for such blood testing are often readily available, thereby providing the "traditional justification that a warrant provides." *Id.* at 1559 (citing *Atwater v. Lago Vista*, 532 U.S. 318, 347 n. 7 (2001)); *see also Skinner*, 489 U.S. at 622 (noting that a "warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope"). The marginal benefit to law enforcement in combating Texas's drunk-driving problem through warrantless searches is generally outweighed by an individual's substantial privacy interest here.

It is suggested by the dissenting opinions that a Fourth Amendment balancing test may properly be applied in these circumstances. Balancing the interests in this case, the dissenting opinions conclude that a warrantless, nonconsensual blood draw conducted pursuant to provisions in the Transportation Code should be upheld as generally reasonable in light of the Legislature's clear intent to except such a search from the warrant requirement; the statute's clear notice to repeat-offenders that they are subject to a mandatory search; and the similarities between this situation and situations involving constitutionally permissible warrantless searches of probationers, parolees, and arrestees. We disagree that these considerations present a valid justification for departing from the

traditional Fourth Amendment framework that requires either a warrant or an applicable exception.

Specifically, with respect to the contention that the Legislature has clearly indicated its desire to create a new exception to the warrant requirement, we observe that the statutory language itself is silent as to whether a law-enforcement officer conducting a mandatory, nonconsensual search of a DWI suspect's blood is required to first seek a warrant. *See* TEX. TRANSP. CODE § 724.012(b) (stating that a peace officer "shall require the taking of a specimen" of a suspect's breath or blood if one of the enumerated aggravating circumstances is present, but making no reference to Fourth Amendment warrant requirement). In any event, it is unclear why the Legislature's intent in enacting the mandatory-blood-draw statute should be dispositive of our analysis. The Legislature "may not restrict guaranteed rights set out in constitutional provisions." *Venn v. State*, 218 S.W. 1060 (Tex. Crim. App. 1920). To the extent the mandatory-blood-draw statute may be interpreted as authorizing a warrantless search that would violate a defendant's rights under the Fourth Amendment, it cannot do so. *See id.* We thus disagree with the assertion that a warrantless, nonconsensual search of a DWI suspect's blood may be upheld as constitutionally reasonable on the basis of the Legislature's putative intent to permit such a search.

For similar reasons, we disagree with the contention that a search of this nature should be upheld as reasonable on the basis that the statute gives clear notice to repeat-DWI offenders of their obligation to provide a blood or breath specimen. Although we may agree that the statutory scheme gives clear notice of the existence of implied consent and the requirement that a specimen be collected under certain circumstances, the statutory scheme does not expressly make clear that suspects will be required to submit to warrantless searches. *See* TEX. TRANSP. CODE §§ 724.011, 724.012. Even accepting the proposition that a DWI suspect may be deemed to have knowledge that

a search of his blood is statutorily required under certain circumstances, he may also reasonably expect that such a search will be carried out in accordance with his Fourth Amendment rights. We are not persuaded that the implied-consent and mandatory-blood-draw provisions place suspects on clear notice that they are categorically subject to warrantless, nonconsensual searches.

With respect to the suggestion that requiring a third-offender DWI suspect to submit to having his blood drawn over his objection and without a warrant is analogous to the constitutionally permissible warrantless, nonconsensual searches of parolees and probationers, we disagree with that contention. The Supreme Court has explained why it is constitutionally permissible to conduct warrantless, nonconsensual searches of parolees and probationers. *See Knights*, 534 U.S. at 116; *Samson*, 547 U.S. at 852; *Griffin*, 483 U.S. at 873. In *Knights*, the Supreme Court upheld a warrantless search of Knights' dwelling, explaining that Knights' status as a probationer and his express agreement to submit to warrantless searches were "salient," and it further noted that probation, "like incarceration, is a form of criminal sanction imposed . . . after verdict, finding, or plea of guilty." *Knights*, 534 U.S. at 119. Thus, a probationer's freedom from imprisonment is subject to "reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Id.* The Court stated, "The judge who sentenced Knights to probation determined that it was necessary to condition the probation on Knights' acceptance of the search provision. . . . The probation order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition thus significantly diminished Knights' reasonable expectation of privacy." *Id*. at 120. The *Knights* Court observed that probationers are "more likely than the ordinary citizen to violate the law," and the government was accordingly justified in focusing on probationers "in a way that it does not on the ordinary citizen." *Id.*

Similarly, in *Samson*, the Court upheld the warrantless search of a parolee who had been stopped on the sidewalk and subjected to a search of his person in the absence of reasonable suspicion. *Samson*, 547 U.S. at 857. As in *Knights*, the Court upheld the warrantless search primarily on the basis that parolees "are on the continuum of state-imposed punishments" and thus have "severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852. It concluded that Samson "did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 853. The holdings of both *Knights* and *Samson* are clearly rooted in the limited privacy interests of individuals who are actively subject to criminal penalties, thereby permitting "privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.*

In contrast to parolees and probationers, DWI suspects who have completed their sentences are not free on conditional liberty. Rather, DWI suspects who have discharged their sentences on their earlier DWI convictions enjoy absolute liberty from their prior convictions and have no ongoing supervisory relationship with any parole or probation officer. "To a greater or lesser degree, it is always true of probationers (as we have said to be true of parolees) that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin*, 483 U.S. at 874. Furthermore, the situation faced by parolees and probationers is "an ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial—between the object of the search and the decisionmaker." *Id*. at 879. In view of the basis for the Court's holdings in *Knights* and *Sampson*, we conclude that there is no rational comparison between the reduced liberty interests of parolees and probationers, who have only conditional liberty and a supervisory relationship with a law-enforcement officer, and repeat-offender DWI suspects, who have fully discharged their earlier sentences and who have

absolute liberty and no ongoing supervisory relationship. *See Knights*, 534 U.S. at 118; (observing that, in light of his status, Knights had "signficantly diminished" expectation of privacy); *Samson,* 547 U.S. at 853.

Furthermore, as explained previously, the Supreme Court's holding in *McNeely* makes clear that drawing the blood of an individual suspected of DWI falls under the category of cases holding that "a warrantless search of the person is reasonable only if it falls within a recognized exception" to the warrant requirement. *McNeely*, 133 S. Ct. at 1558. The Court in *McNeely* further explained that such an intrusion implicates an individual's "'most personal and deep-rooted expectations of privacy.'" *Id.* (quoting *Winston*, 470 U.S. at 760). These principles from *McNeely*—the recognition of the substantial privacy interests at stake and the applicability of the traditional Fourth Amendment framework that requires either a warrant or an applicable exception—apply with equal force to this case.

We hold that the provisions in the Transportation Code do not, taken by themselves, form a constitutionally valid alternative to the Fourth Amendment warrant requirement. We thus reject the State's assertion that a warrantless, nonconsensual blood draw conducted pursuant to those provisions can fall under one of the established exceptions to the warrant requirement described above, and we further reject the State's suggestion that such a search may be upheld under a general Fourth Amendment balancing test. We overrule the State's first ground.

### IV. Constitutionality of Blood-Draw Statute

The State's third ground asks this Court to review "[w]hether the Thirteenth Court of Appeals erred in concluding that the mandatory [blood] draw statute does not allow the arresting officer to draw blood without a search warrant or exigent circumstances, and specifically[,] whether the court

failed to consider the distinction between the statutory directive for the arresting officer to require

or order the draw, and the nature of a warrant as an order of the issuing magistrate for the draw in

question." The essence of the State's complaint is that, in interpreting the statutory language during

the course of analyzing whether the statute was constitutional "as applied" to Villarreal, the court

of appeals erred by determining that the plain language in the statute did not dispense with the

requirement that an officer seek and obtain a search warrant. *See Villarreal*, 2014 WL 1257150, at

\*11 (observing that the "literal text" of Section 724.012 "does not address or purport to dispense"

with the warrant requirement). Having already determined that Villarreal's Fourth Amendment

rights were violated when his blood was drawn without a warrant in light of his refusal to submit to

the taking of a specimen, any further statutory analysis of whether the mandatory-blood-draw law

itself purports to authorize such a warrantless search is unnecessary to resolve this Fourth

Amendment issue. The remainder of the State's challenge with respect to the meaning of the

statutory language pertains to the conclusion by the court of appeals that the statute was not

unconstitutional.[15]

---

[15]     The court of appeals cited this Court's decision in *Beeman v. State* for the proposition that "the constitutionality of the repeat offender provision of the mandatory-blood-draw law must be based on the previously recognized exceptions to the Fourth Amendment's warrant requirement." *See State v. Villarreal*, No. 13-13-00253-CR, 2014 WL 1257150 (Tex. App.—Corpus Christi 2014) (citing *Beeman v. State*, 86 S.W.3d 613, 615 (Tex. Crim. App. 2002)). In that case, after his blood was drawn pursuant to a search warrant, *Beeman* argued that the State had no right to obtain a search warrant to draw his blood in light of implied-consent laws for DWI cases. *Id*. In deciding that the State may properly seek a warrant to collect a blood specimen regardless of a suspect's refusal to submit a specimen under implied-consent laws, this Court stated, "The implied consent law expands on the State's search capabilities by providing a framework for drawing DWI suspects' blood in the absence of a search warrant. It gives officers an additional weapon in their investigative arsenal, enabling them to draw blood in certain limited circumstances even without a search warrant." *Id*. *Beeman* also observed that implied-consent laws do not give police officers anything "more than [what] the Constitution already gives them." *Id.* at 616. The holding in *Beeman*, that an officer may

(continued...)

Villarreal's constitutional challenge, however, was abandoned at the trial-court level. Villarreal's written motion to suppress stated, "[I]f the defendant's blood was taken under the authority of a statute, the statute should be deemed unconstitutional." Later, however, Villarreal abandoned that complaint. Villarreal narrowed the focus of his motion to suppress to the question of whether the mandatory blood draw conducted without a warrant in this particular case violated the Fourth Amendment. And the trial court's findings of fact specifically determined that Villarreal had narrowed the grounds in his motion to address only the Fourth Amendment violation. The trial court's second fact finding stated, "The Court finds that the Defendant narrowed the focus of his motion, and represented as the sole basis of such motion, his claim that 'taking a blood draw without a warrant [is] a violation of the 4th Amendment.'" We, therefore, sustain the State's third ground to the extent that the court of appeals erred by addressing the constitutionality of the implied-consent statute because Villarreal abandoned his constitutional challenge in the trial court.

## V. Conclusion

We hold that a nonconsensual search of a DWI suspect's blood conducted pursuant to the mandatory-blood-draw and implied-consent provisions in the Transportation Code, when undertaken in the absence of a warrant or any applicable exception to the warrant requirement, violates the Fourth Amendment. We affirm the judgment of the court of appeals suppressing the blood-test results on the basis of a Fourth Amendment violation.

---

(...continued)
obtain a search warrant even where implied consent statutes would authorize an involuntary blood draw, remains good law. *See id*. But because it was decided before *McNeely*, *Beeman* has limited value with respect to the instant question whether a person's Fourth Amendment rights are violated when his blood is drawn over his objection pursuant to the implied-consent statute.

Delivered: November 26, 2014

Publish