# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00189-CR

**Fred Schneider, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
## NO. 12-2076-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following the denial of his motion to suppress evidence, a jury found appellant Fred Schneider guilty of third-degree felony driving while intoxicated (DWI). *See* Tex. Penal Code § 49.04 (listing elements of DWI); *id.* § 49.09(b)(2) (providing that DWI is third-degree felony if defendant had two prior convictions for enumerated offenses). The jury then assessed punishment at four years' imprisonment and a $3,000 fine and recommended that the prison time be probated. The trial court sentenced Schneider to four years in prison, probated for seven years, and a fine. In three points of error, Schneider contends that the trial court erred in denying his motion to suppress the results of Schneider's blood specimen obtained without a warrant, that the trial court erred by denying his request for a jury instruction under Texas Code of Criminal Procedure article 38.23, and that his conviction violates the protection against ex post facto laws guaranteed by article I, section 16 of the Texas Constitution. We will reform the trial court's judgment to correct a clerical error and affirm the judgment as modified.

# BACKGROUND[1]

On December 16, 2012, Schneider drank beer with a couple of friends at a restaurant. As Schneider was driving home, he struck a vehicle parked on the side of the street near his house. Schneider then continued driving home and entered his house, where he lived with his girlfriend, Melissa Ferrell.

Detective Jason Waldon of the Williamson County Sheriff's Office arrived at the scene of the collision at 10:05 p.m. after receiving a report of a hit and run. Detective Waldon spoke with witnesses, took photographs of the damaged vehicle, and gathered pieces of glass from the roadway. Deputy Jeremy Hammett, also of the sheriff's office, joined Detective Waldon at the scene at 10:10.

One of the witnesses told Detective Waldon where the hit-and-run suspect's vehicle had gone after the collision, and this led Detective Waldon to Schneider's house. Detective Waldon arrived at Schneider's house at around 10:14 and noticed that Schneider's vehicle had damage that was consistent with the damage he had observed on the parked vehicle. Detective Waldon knocked on the door of Schneider's house, and Ferrell opened the door. Ferrell told Detective Waldon that Schneider was in the bathroom and had a gun. Detective Waldon backed out of the doorway, and Ferrell went back inside the house.

Because of the possibility that Schneider was armed, Detective Waldon had the police radio channels closed so they could be used in case of emergency. Deputy Hammett responded to a call from Waldon, arriving at Schneider's house in "[a] matter of a few seconds." The two officers

---

[1] The facts recited herein are taken from the testimony and exhibits presented at trial.

2

then entered the house and instructed Schneider to come out of the back bedroom. Schneider came out immediately and without a gun. While Deputy Hammett provided cover, Detective Waldon placed Schneider in handcuffs. Deputy Hammett then performed a protective sweep of the house to check for threats. Detective Waldon also suspected that family violence may have occurred because of a "conversation that was occurring between Mr. Schneider and Ms. Ferrell" and the fact that Schneider had a cut across the bridge of his nose. Ferrell later told Detective Waldon that Schneider got the cut when he fell over some boxes because, "due to his level of intoxication, he couldn't keep his balance."

Detective Waldon moved outside with Schneider and had a conversation with him, which Detective Waldon recorded. During this conversation, Detective Waldon noticed signs that led him to believe that Schneider was intoxicated, including slurred speech, glassy eyes, unsteady stance, lethargy, and the odor of alcohol. When Detective Waldon explained to Schneider that he had been called by "[t]he people whose truck was hit," Schneider stated, "I hit that truck." Detective Waldon then read Schneider his *Miranda* warnings and asked him how much he had to drink. Schneider responded that he had "[a] few beers." Another officer transported Schneider to the Williamson County jail, leaving Schneider's house at 10:58 p.m. Detective Waldon followed them and arrived at the jail at 11:19.

Once at the jail, Detective Waldon asked Schneider if he would be willing to take field sobriety tests, and Schneider refused. At 11:45 p.m., Detective Waldon filled out a DIC-24 form, which warned Schneider that his driver's license would be suspended if he refused to provide a breath or blood specimen. Schneider signed the form and indicated that he was refusing to provide

3

a specimen. Detective Waldon then accessed Schneider's criminal history and learned that Schneider had prior DWI convictions. Believing that he was required by statute to perform a "mandatory blood draw," Detective Waldon directed a phlebotomist at the jail to collect a sample of Schneider's blood at 12:43 a.m. on December 17. *See* Tex. Transp. Code § 724.012(b) ("A peace officer shall require the taking of a specimen of the person's breath or blood" if person is arrested on suspicion of DWI, suspect refuses to submit voluntarily to taking of specimen, and other conditions are met). Schneider's blood was later analyzed and revealed an alcohol blood concentration of .215.

Schneider was charged with DWI and filed a motion to suppress the results of his blood analysis. At a hearing on his motion to suppress, Detective Waldon testified that he had Schneider's blood drawn without a warrant and without Schneider's consent because "[t]hat was the law at that time." He further explained, "For a felony DWI, we would just do a mandatory blood draw if the person refused." Detective Waldon agreed that "the only legal authority that [he] relied on to draw [Schneider's] blood that night was the fact that [he] thought there was a statute that said [he] could do it" and that he was not "relying on any other legal authority other than just that statute."

Detective Waldon also testified that there was a prosecutor on duty "24/seven" that he could have called but that he did not call a prosecutor because "[i]t was mandatory blood draw. It didn't require any assistance from the DA's Office for that." When asked how the DA's office would have responded if he had called and "asked for them to contact a judge and get a warrant signed that night," Detective Waldon responded, "I don't believe that they would have done it for me because it would have been unnecessary since it was a mandatory draw." Detective Waldon testified that it would probably have taken a minimum of two hours to obtain a warrant.

4

Deputy Hammett testified that because of the allegation that Schneider had a gun, this was not a typical DWI case, stating that "this case was atypical in the extreme" and "was about the most extreme" DWI investigation he had experienced. He also testified that no magistrate was available after hours at the time of the incident. In addition, Lytza Rojas, a prosecutor with the Williamson County District Attorney's Office, testified that, at the time, her office's policy was not to obtain warrants for blood draws in DWI cases "[i]f there were two confirmed misdemeanor DWIs, bringing it up to a felony level." Rojas further testified that if an officer had called her and asked for a warrant in a felony DWI case, she would have responded, "[Y]ou don't need a warrant, and I'm not going to wake up a judge for that." Finally, Rojas testified that it could take anywhere from thirty minutes to an hour and a half to obtain a warrant and that there have been times when she has attempted to contact a judge in the middle of the night and been unable to reach one.

The trial court orally announced that it was denying Schneider's motion to suppress, and the trial proceeded. At the charge conference, Schneider requested a jury instruction pursuant to article 38.23. *See* Tex. Code Crim. Proc. art. 38.23(a) ("In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained."). Schneider argued, among other things, that the jury was entitled to decide whether exigent circumstances existed that justified a warrantless blood draw. The trial court refused to include an article 38.23 instruction in the jury charge.

After Schneider was found guilty, the trial court signed an order that denied Schneider's motion to suppress and included findings of fact and conclusions of law. In this order, the trial court found that Schneider's blood was not drawn until "three hours after the investigation began—even

5

without attempts to obtain a warrant." After summarizing testimony concerning the process of obtaining a warrant in this case, the trial court stated, "The Court finds credible the uncontroverted testimony of all the testifying witnesses, including taking judicial notice from personal experience, that this process would have taken approximately two additional hours from the point in time the defendant refused to submit voluntarily to a blood test." The trial court additionally found the following:

> Under these facts and circumstances, the Court finds that an officer might reasonably have believed that such additional delay would have undermined the efficacy of the search. As it was, due to the defendant's leaving the scene, it was not until an hour after the traffic accident that officers developed probable cause to arrest defendant for DWI in the first instance, and even later learned of a potential felony-level DWI that prompted the mandate to obtain a blood sample.

After reviewing case law concerning warrantless blood draws, the trial court concluded the following:

> The Court further concludes that exigent circumstances did exist that could have caused an officer to reasonably believe that the efficacy of a blood specimen would be undermined by further delay in obtaining a warrant. Defendant's actions in leaving the scene put into motion a lengthy time delay that caused officers to diverge from a typical routine DWI investigation. These factors included the necessity of going to a second location where they were faced with a potential family violence situation that necessitated a protective sweep and other protective protocols.
>
> ***
>
> The Court finds and concludes that the exigencies present in this case are consistent with the type of time-delay exigencies discussed in [*Missouri v. McNeely*, 133 S. Ct. 1552 (2013)] that would justify a warrantless search, such as the lengthy process of obtaining a warrant and the special circumstances that arose from the defendant's leaving the scene along with the special circumstances surrounding a felony level DWI.

The trial court later signed a judgment of conviction, and this appeal followed.

**STANDARD OF REVIEW**

We review a trial court's ruling on a motion to suppress for abuse of discretion, using a bifurcated standard. *Goodwin v. State*, 376 S.W.3d 259, 266 (Tex. App.—Austin 2012, pet. ref'd). In doing so, we view the evidence in the light most favorable to the trial court's ruling. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). When the trial court makes express findings of historical fact, as it did here, we afford almost total deference to those findings as long as they are supported by the record, and we also view the findings in the light most favorable to the trial court's ruling. *State v. Granville*, 423 S.W.3d 399, 404 (Tex. Crim. App. 2014). In addition, we give almost total deference to rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an assessment of credibility and demeanor of witnesses. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). We review de novo pure questions of law and mixed questions of law and fact that do not depend on evaluating credibility and demeanor. *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011). We review de novo the legal question of whether exigent circumstances existed that justified a warrantless arrest. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) ("[W]e review a trial court's application of the law of search and seizure to the facts *de novo*."); *Evans v. State*, No. 14-13-00642-CR, 2015 WL 545702, at *6 (Tex. App.—Houston [14th Dist.] Feb. 10, 2015, pet. filed) (mem. op., not designated for publication) ("Although all findings of historical fact supported by the record must be implied in favor of the trial court's ruling that the

7

blood draw should not be suppressed, whether those facts meet the legal standard of exigent circumstances is a legal question that we review de novo.").

**DISCUSSION**

*Motion to suppress*

In his first point of error, Schneider contends that the trial court erred in denying his motion to suppress because the warrantless collection of his blood violated the Fourth Amendment as interpreted by the United States Supreme Court in *Missouri v. McNeely*.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *State v. Villarreal*, 475 S.W.3d 784, 795 (Tex. Crim. App. 2014) (citing *Riley v. California*, 134 S. Ct. 2473, 2482 (2014)). The Supreme Court has held that a search is reasonable only if it is conducted pursuant to a warrant or if it falls within a recognized exception to the warrant requirement. *See McNeely*, 133 S. Ct. at 1558 ("Our cases have held that a warrantless search of the person is reasonable only if it falls within a recognized exception."). The drawing of a person's blood is a search under the Fourth Amendment. *See Schmerber v. California*, 384 U.S. 757, 769 (1966) (describing blood draws as "searches involving intrusions beyond the body's surface"); *State v. Webre*, 347 S.W.3d 381, 385 (Tex. App.—Austin 2011, no pet.). Indeed, as the Supreme Court has recognized, "[s]uch an invasion of bodily integrity implicates an individual's 'most

personal and deep-rooted expectations of privacy.'" *McNeely*, 133 S. Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)).

If a defendant seeks to suppress evidence on the ground that it was collected in violation of the Fourth Amendment, the defendant bears an initial burden to overcome the presumption of proper police conduct. *See Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007); *Martinez v. State*, 220 S.W.3d 183, 186 (Tex. App.—Austin 2007, no pet.). If the defendant meets this burden by establishing that the search or seizure occurred without a warrant, the burden shifts to the State to prove that the search or seizure was reasonable under the totality of the circumstances. *See Amador*, 221 S.W.3d at 672–73.

One exception to the warrant requirement "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *McNeely*, 133 S. Ct. at 1558 (internal quotation marks omitted). "[T]he need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (internal quotation marks omitted). Texas courts apply an objective standard in determining whether an officer reasonably relied on exigent circumstances in making a warrantless search based on the facts and circumstances known to the officer at the time of the search. *See Colburn v. State*, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998); *Evans*, 2015 WL 545702, at *5; *Stone v. State*, 279 S.W.3d 688, 692 (Tex. App.—Amarillo 2006, pet. ref'd).

The Supreme Court has explained the exigency exception to the warrant requirement in drunk-driving cases. In *Schmerber v. California*, Schmerber had driven himself and a companion

away from a bowling alley after they had been drinking. *Schmerber*, 384 U.S. at 758 n.2. The car skidded and struck a tree, and both Schmerber and his companion were taken to a hospital for treatment. *Id.* At the hospital, a police officer directed a physician to collect a sample of Schmerber's blood without a warrant and without Schmerber's consent. *Id.* at 758. An analysis of this sample indicated intoxication, and Schmerber objected to the admission of this evidence at his DWI trial. *Id.* at 759.

The Supreme Court held that the warrantless collection of Schmerber's blood was constitutional because the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *Id.* at 770 (internal quotation marks omitted). The Court explained its decision as follows:

> We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

*Id.* at 770–71.

Later, in *Missouri v. McNeely*, the Supreme Court considered "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." *McNeely*, 133 S. Ct. at 1556. The Court rejected such a per se rule and explained that "the

10

reasonableness of a warrantless search under the exigency exception to the warrant requirement must be evaluated based on the totality of the circumstances." *Id.* at 1560. However, the Supreme Court did not overrule *Schmerber*. Instead, the Court explained that it was applying the same approach as it had applied in *Schmerber*: "[O]ur analysis in *Schmerber* fits comfortably within our case law applying the exigent circumstances exception. In finding the warrantless blood test reasonable in *Schmerber*, we considered all of the facts and circumstances of the particular case and carefully based our holding on those specific facts." *Id.* The Court also noted that "the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case." *Id.* at 1563.

Here, Schneider argues that there were no exigent circumstances justifying a warrantless blood draw. According to Schneider, neither his collision with a parked vehicle, nor his leaving the scene of the collision, nor the incident at his house involving the alleged weapon significantly delayed the officers' investigation. Schneider points out that Detective Waldon arrived at the scene of the accident at 10:05 p.m. and Schneider was in handcuffs before 10:30. Schneider also points out that Detective Waldon never called anyone to ask for help in obtaining a warrant despite the fact that other officers were on-duty and a prosecutor was on-call at all times.

It is true that a traffic accident alone does not constitute an exigency. *See Evans*, 2015 WL 545702, at *6. However, the need to investigate a traffic accident can contribute to the exigency of a situation. *See Schmerber*, 384 U.S. at 771 (concluding that emergency existed in part because "time had to be taken . . . to investigate the scene of the accident"). In *McNeely*, the Supreme Court recognized that the dissipation of alcohol from the blood, when combined with causes of delay present in a particular case, could give rise to exigent circumstances:

11

> While experts can work backwards from the BAC at the time the sample was taken to determine the BAC at the time of the alleged offense, longer intervals may raise questions about the accuracy of the calculation. For that reason, exigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process.

*McNeely*, 133 S. Ct. at 1563.

Considering the totality of the circumstances and viewing the specific facts of this case in the light most favorable to the trial court's ruling, we conclude that exigent circumstances existed that could have caused Detective Waldon to reasonably believe that the further delay required to obtain a search warrant would jeopardize the efficacy of the evidence of Schneider's blood alcohol content. Although Schneider was placed under arrest less than an hour after Detective Waldon arrived at the scene of the accident, Schneider's collision with a parked vehicle and his decision to flee the scene set in motion a chain of events that significantly delayed Waldon's ability to obtain a blood specimen. Because of the confusion caused by the hit and run and the incident at Schneider's house, Detective Waldon had to spend extra time investigating the case and determining whether Schneider had in fact committed a crime. Even without obtaining a warrant, Schneider's blood was not collected until almost three hours had passed since the accident. Moreover, we give great deference to the trial court's factual finding that obtaining a warrant could have taken an additional two hours. *See id.* (noting that "the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*").

This was not a typical DWI case. This case involved a hit and run, allegations that Schneider was armed, possible domestic abuse, and an uncertain warrant process. Based on the

record before us, we cannot conclude that the trial court abused its discretion by denying Schneider's motion to suppress.[2]  Accordingly, we overrule Schneider's first point of error.

### *Jury charge*

In his second point of error, Schneider contends that the trial court erred by rejecting his proposed jury instruction under article 38.23.  Specifically, Schneider complains that "the jury was not instructed that it could disregard the blood alcohol evidence in this case if it determined Appellant's blood was drawn in violation of the United States Constitution or the laws of the State of Texas."

We review claims of jury charge error using a two-pronged test.  *See Kuhn v. State*, 393 S.W.3d 519, 524 (Tex. App.—Austin 2013, pet. ref'd).  We first determine whether charge error exists.  *Id.*  If there is error, we next evaluate the harm caused by the error.  *Id.*  A defendant is only entitled to a jury instruction under article 38.23 if three requirements are met:  "(1) The evidence heard by the jury must raise an issue of fact; (2) The evidence on that fact must be affirmatively contested; and (3) That contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence."  *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007).

In his brief, Schneider states the following:

---

[2] This case is distinguishable from *State v. Villarreal*, 475 S.W.3d 784 (Tex. Crim. App. 2014), *State v. Hill*, No. 03-13-00834-CR, 2016 WL 690738 (Tex. App.—Austin Feb. 17, 2016, pet. filed), and *State v. Molden*, No. 03-14-00166-CR, 2016 WL 690795 (Tex. App.—Austin Feb. 17, 2016, pet. filed), because, in those cases, the courts did not have to decide whether exigent circumstances beyond the natural dissipation of alcohol in the blood justified a warrantless blood draw.  This case is also distinguishable from *Roop v. State*, No. 03-13-00141-CR, 2016 WL 690755 (Tex. App.—Austin Feb. 17, 2016, pet. filed), because, in *Roop*, the suspect did not flee the scene of the traffic accident and neither the accident nor any other unusual circumstances caused any significant delay in obtaining a sample of the suspect's blood.  *See id.* at *5.

> As discussed extensively above, Appellant's blood was drawn without a warrant and the State was unable to show exigent circumstances which would justify the warrantless seizure of Appellant's blood. Therefore, evidence of his blood alcohol content should have been excluded from evidence, but if allowed, the jury should have had the opportunity to follow the law and disregard that evidence.

(citation omitted). We conclude that Schneider has not identified an issue of material fact raised by conflicting evidence heard by the jury. His argument appears to assume that the constitutionality of Schneider's blood draw was a question of fact to be decided by the jury. However, whether particular facts constitute exigent circumstances that justify a warrantless search is a question of law. *See Valtierra*, 310 S.W.3d at 447; *Evans*, 2015 WL 545702, at *6; *see also Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012) ("Where the issue raised by the evidence at trial does *not* involve controverted historical facts, but only the proper application of the law to undisputed facts, that issue is properly left to the determination of the trial court."). Therefore, he was not entitled to a jury instruction under article 38.23. Accordingly, we overrule Schneider's second point of error.

### Ex post facto law

In his third point of error, Schneider contends that "his conviction violates his protection against the imposition of *Ex Post Facto* Laws where the State was allowed to enhance Appellant's punishment with convictions not previously available for such." *See* Tex. Const. art. 1, § 16 ("No . . . ex post facto law . . . shall be made."). According to Schneider, at the time he pleaded guilty to charges of DWI "in 1986 and 1989, the law in place instructed that if a person was not arrested for the offense of driving while intoxicated for the superseding ten years, any previous conviction for driving while intoxicated could not be used against him." Now, however, this

ten-year limit has been repealed, and Schneider's previous convictions were used to enhance his offense even though the prior convictions were more than ten years old.

This Court has already squarely rejected Schneider's argument. As this Court explained in *Saucedo v. State*:

> We hold that the ten-year time limitation on the use of prior DWI convictions found in [the predecessor of Texas Penal Code section 49.09] was not an explicit guarantee that those convictions could not be used in the future, but only a restriction on what prior convictions could be used to enhance a DWI offense at that time. Therefore, by removing all time limitations on the use of prior DWI convictions to enhance current DWI charges, the 2005 changes to the DWI enhancement statute did not increase appellant's punishment for the prior convictions and is not an *ex post facto* law.

*Saucedo v. State*, No. 03-06-00305-CR, 2007 WL 1573948, at *4 (Tex. App.—Austin May 30, 2007, no pet.) (mem. op., not designated for publication); *see Bailey v. State*, No. 03-09-00276-CR, 2010 WL 2428085, at *5 (Tex. App.—Austin June 18, 2010, pet. ref'd) (mem. op., not designated for publication) ("[C]ourts have held that for purposes of enhancement, the use of prior convictions that could not have been used at the time they were originally committed is not a violation of the prohibition against ex post facto laws."); *Castillo v. State*, No. 03-07-00546-CR, 2008 WL 3540063, at *1 (Tex. App.—Austin Aug. 14, 2008, no pet.) (mem. op., not designated for publication) (rejecting appellant's argument "that allowing the prior convictions to be used for enhancement purposes under subsection 49.09(e) of the penal code, which was amended in 2001 to allow, under certain conditions, the use of prior convictions older than ten years, would violate the ex post facto provisions of the state and federal constitutions") (footnote omitted); *Townsend v. State*, No. 03-05-00766-CR, 2007 WL 2141265, at *1 (Tex. App.—Austin July 26, 2007, pet. ref'd) (mem. op., not designated for publication) (same); *see also Van Duren v. State*, No. 01-13-00103-CR, 2014 WL 5500482, at *3

15

(Tex. App.—Houston [1st Dist.] Oct. 30, 2014, pet. ref'd) (mem. op., not designated for publication) ("We agree with the majority of Texas courts of appeals that have addressed the issue and concluded that the 2005 amendment to section 49.09 is not an ex post facto law.") (collecting cases). Accordingly, we overrule Schneider's third point of error.

### *Clerical error in the judgment*

Finally, we note that the trial court's judgment contains contradictory information concerning whether Schneider pleaded guilty to this offense. However, the record shows that Schneider pleaded not guilty and the case was tried to a jury. Moreover, nothing in the record suggests that Schneider pleaded guilty, and the trial court's certification of Schneider's right of appeal states that this was not a plea bargain case. This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, even though neither party raised the issue on appeal, we reform the judgment by striking any reference to a plea bargain and any statement suggesting that Schneider pleaded guilty. In addition, we note that the judgment improperly includes a deadly-weapon finding. The record indicates that the trial court granted Schneider's motion for a directed verdict on the deadly-weapon issue and no deadly-weapon instructions were submitted to the jury. Therefore, we further reform the judgment to eliminate the deadly-weapon finding.

### CONCLUSION

Having overruled each of Schneider's points of error, we affirm the trial court's judgment as modified.

16

_____

Scott K. Field, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Modified and, as Modified, Affirmed

Filed:   April 6, 2016

Do Not Publish