# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00503-CR

**The State of Texas, Appellant**

**v.**

**Elle Obering O'Brien, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 5 OF TRAVIS COUNTY
### NO. C-1-CR-11-217744
### HONORABLE NANCY WRIGHT HOHENGARTEN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following her arrest for the misdemeanor offense of driving while intoxicated,[1] appellee Elle Obering O'Brien's blood was drawn without a warrant pursuant to section 724.012(b) of the Texas Transportation Code, commonly known as the mandatory-blood-draw statute.[2] Prior to trial, O'Brien filed a motion to suppress evidence relating to the results of the blood draw, which the trial court granted following a hearing. In three points of error on appeal, the State asserts that the trial court abused its discretion in granting the motion to suppress. We will affirm the trial court's order.

---

[1] *See* Tex. Penal Code §§ 49.04(b).

[2] *See* Tex. Transp. Code § 724.012(b).

## BACKGROUND

At the hearing on the motion to suppress, the trial court heard evidence that on October 23, 2011, at approximately 1:48 a.m., Austin Police Department (APD) Officer Matthew Paredes and his partner Gabriel Vasquez had responded to a call of a disturbance at a fast-food restaurant in South Austin. Officer Paredes testified that when he and Vasquez arrived at the restaurant, they encountered three women, later identified as O'Brien; O'Brien's friend, Wynonah Bearden; and Lidia Aviles-Martinez, a restaurant employee. According to Paredes, Aviles-Martinez was attempting to assist Bearden, who was crying hysterically and claiming that her face had been sprayed with mace or pepper spray. After calling EMS and attempting to calm Bearden, Paredes spoke with O'Brien in order to ascertain what had happened. Paredes testified that O'Brien told him that she and Bearden had been at a club downtown when "some group sprayed them with pepper spray," prompting them to leave the club. According to Paredes, during his conversation with O'Brien, she provided conflicting accounts of how she and Bearden had arrived at the restaurant, including that they had driven there themselves, that O'Brien's boyfriend had driven them to the restaurant and dropped them off there, and that they had walked to the restaurant from a parking lot down the street. Paredes added that O'Brien kept attempting to "walk away" from him as he spoke with her.

Meanwhile, Paredes recounted, he and Vasquez had received a call from dispatch that there had been a hit-and-run accident downtown involving a pedicab and a black BMW. Paredes testified that Aviles-Martinez, the restaurant employee, had told Vasquez that O'Brien and Bearden had arrived at the restaurant in a black BMW and that O'Brien had been driving the vehicle. Aviles-Martinez then directed the officers to the vehicle, which was located in a parking space

2

at the restaurant. Paredes testified that when he and Vasquez examined the BMW, it matched the description of the vehicle that had been identified in the accident, including the license-plate number. Paredes then called the pedicab driver and received more information concerning the collision, including that it had involved an injury to the pedicab passenger, who had been transported to a hospital for treatment. From that point forward, Paredes recounted, he treated O'Brien as a DWI suspect.

Paredes testified that during his interview with O'Brien, she admitted to having "a few shots of whiskey" that night. Paredes also testified that he noticed an odor of alcohol on O'Brien's breath. Paredes then proceeded to administer to O'Brien the standardized field sobriety tests and, based on her performance on those tests, came to the conclusion that O'Brien was intoxicated. At approximately 2:34 a.m.,[3] Paredes arrested O'Brien for driving while intoxicated and subsequently requested a sample of her breath or blood. According to Paredes, O'Brien refused.

Following the arrest, Paredes did not immediately transport O'Brien to the Travis County Jail. Instead, Paredes testified, he and Vasquez waited for Bearden's boyfriend to arrive at the restaurant to drive her home. As they waited, Paredes called the pedicab passenger at the hospital and asked her to provide details concerning the collision and the extent of her injuries. Also as they waited, the officers proceeded to inventory the BMW, which, Paredes explained, "took longer than usual because there was pepper spray all along the passenger side of the vehicle." After the inventory of the vehicle was complete, Paredes recounted, Bearden's boyfriend still

---

[3] A video recording of the investigation and arrest, taken from the dashboard camera of Paredes's patrol car, was admitted into evidence at the suppression hearing. The recording reflects 2:34 a.m. as the time of arrest.

had not arrived at the restaurant. Beginning to suspect that the boyfriend would not arrive, but not wanting to leave Bearden alone at the restaurant because she too appeared to be intoxicated, Paredes proceeded to arrest Bearden for public intoxication and placed her in the back of his patrol car along with O'Brien. The officers then left the restaurant at approximately 3:08 a.m.

Paredes also testified that, in addition to him and Vasquez, a third officer, Brandon Bullock, was present at the restaurant during most of the investigation. According to Paredes, Officer Bullock, who had arrived at the restaurant in his own patrol car, was capable of making arrests, inventorying a vehicle, and calling EMS to investigate the collision. Paredes could not remember whether Bullock was still at the restaurant when he and Vasquez departed for the jail, but he believed that Bullock might have "left either while I was still there or we left at the same time."

Paredes and Vasquez arrived at the Travis County Jail at approximately 3:15 a.m.[4] According to Paredes, once they arrived, the jail "was busy because it was a Saturday night," and they had to "wait outside for a little bit" before Paredes could get inside the jail and complete the paperwork for obtaining a mandatory blood draw. When O'Brien's blood was finally drawn, Paredes recounted, it was approximately 4:44 a.m. Paredes testified that he did not seek a warrant in this case because the Transportation Code allowed him to proceed without one. However, Paredes also testified that he had on other occasions obtained search warrants for a person's blood. When asked how long it takes him to obtain a blood-draw warrant in a "typical DWI" case, Paredes testified that it usually takes him between 60 and 90 minutes. Paredes agreed with the prosecutor that it takes him

---

[4] Paredes testified that the distance between the restaurant and the jail was 1.5 miles.

"quite a bit longer" than that when there is a collision to investigate, although he did not elaborate on how much longer. According to Paredes, the process for obtaining a warrant involved contacting a detective or supervisor to "write up the warrant" and then waiting at the jail while the detective or supervisor "goes to the judge and gets it signed." On cross-examination, Paredes acknowledged that whether he seeks a blood draw with or without a search warrant, he is required to complete a similar amount of paperwork.

Judge Ronald Meyerson, a magistrate and associate judge with the City of Austin, testified that there is a magistrate available at the jail 24 hours per day and that one of the magistrate's duties is to sign search warrants. According to Judge Meyerson, it usually takes him three to five minutes to review the warrant prior to signing it.

After taking the matter under advisement, the trial court granted the motion to suppress and made findings of fact and conclusions of law, including the following:

> Officer Paredes had probable cause to arrest Elle O'Brien for the offense of Driving While Intoxicated.
>
> There were no exigent circumstances that prevented Officer Paredes from obtaining a search warrant prior to the blood draw.
>
> The blood draw from Elle O'Brien pursuant to Section 724.012 of the Texas Transportation Code does not comply with the 4th Amendment of the U.S. Constitution and is thereby inadmissible. *Missouri v. McNeely*, 133 S. Ct. 1552 (2013).

This appeal by the State followed.

**STANDARD OF REVIEW**

We review a trial court's ruling on a motion to suppress for abuse of discretion.[5] We are to view the record "in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'"[6] "We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case."[7] "The appellate court must apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations."[8] In this case, we review de novo the trial court's application of the law of search and seizure to the facts.[9]

---

[5] *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

[6] *Id*. (quoting *Dixon*, 206 S.W.3d at 590); *see Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex. Crim. App. 1991) (op. on reh'g)).

[7] *Dixon*, 206 S.W.3d at 590 (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

[8] *Martinez v. State*, 348 S.W.3d 919, 922-23 (Tex. Crim. App. 2011) (citing *Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997)).

[9] *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2011); *Thompson v. State*, 408 S.W.3d 614, 621 (Tex. App.—Austin 2013, no pet.); *see also State v. Villarreal*, 475 S.W.3d 784, 798 (Tex. Crim. App. 2014) ("[B]ecause the facts are undisputed and the questions before us are matters of law, we apply a de novo standard of review."); *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004) ("On appeal, the question of whether a specific search or seizure is 'reasonable' under the Fourth Amendment is subject to de novo review. Despite its fact-sensitive analysis, 'reasonableness' is ultimately a question of substantive Fourth Amendment law.").

**ANALYSIS**

**Exigent circumstances**

We first address the State's third point of error, in which it asserts that the trial court erred in concluding that "[t]here were no exigent circumstances that prevented Officer Paredes from obtaining a search warrant prior to the blood draw." The State contends that, contrary to the trial court's finding, there were exigent circumstances in this case, including what the State characterizes as "unusual" circumstances surrounding the DWI investigation at the restaurant, the related investigation of the collision downtown, and the delay once the officers arrived at the jail.

The drawing of a person's blood is considered a search under the Fourth Amendment.[10] Accordingly, a blood draw generally requires a search warrant, unless a "recognized exception" to the warrant requirement applies.[11] "'One well-recognized exception,' and the one at issue in this case, 'applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'"[12] One such exigent circumstance is preventing the destruction of evidence or contraband.[13] In DWI cases, the evidence that is at risk of destruction is a suspect's blood-alcohol content, which "begins to diminish shortly after drinking stops, as the body functions to eliminate

---

[10]  *See Schmerber v. California*, 384 U.S. 757, 769 (1966).

[11]  *See Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013).

[12]  *Id*. (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).

[13]  *See Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007) (citing *McNairy v. State*, 835 S.W.2d 101, 107 (Tex. Crim. App. 1991)).

it from the system."[14]  Accordingly, the Supreme Court has held that the warrantless collection of blood from a DWI suspect does not violate the Fourth Amendment in cases "when the officer might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'"[15]

More recently, however, the Supreme Court has clarified its holding in *Schmerber*, rejecting the argument that "the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk driving cases."[16]  Instead, the Court has held, "exigency in this context must be determined case by case based on the totality of the circumstances."[17]  Although "some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test," in other cases, "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."[18]  This is because "some delay between the time of the arrest or accident and the time of the test is inevitable regardless of whether police officers are required to obtain

[14]  *Schmerber*, 384 U.S. at 770.

[15]  *Id*. (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)).  For example, in *Schmerber*, "time had to be taken to bring the accused to a hospital and to investigate the scene of the accident," and "there was no time to seek out a magistrate and secure a warrant."  *Id*. at 770-71.

[16]  *McNeely*, 133 S. Ct. 1552 at 1556.

[17]  *Id*.

[18]  *Id*.; *see also McDonald v. United States*, 335 U.S. 451, 456 (1948) ("We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made [the search] imperative.")

8

a warrant."[19] If, under the circumstances of the case, "the warrant process will not significantly increase the delay before the blood test is conducted," there can be "no plausible justification for an exception to the warrant requirement."[20]

As with other warrantless searches, the burden is on the State to prove that the warrantless blood draw was reasonable under the totality of the circumstances.[21] "We apply an objective standard of reasonableness in determining whether a warrantless search is justified, taking into account the facts and circumstances known to the police at the time of the search."[22]

In this case, the record supports the trial court's conclusion that the warrantless blood draw was not justified by exigent circumstances. Officer Paredes testified that the reason he did not obtain a warrant was because the Transportation Code and APD policy allowed him to proceed without one; he did not testify that he declined to pursue a warrant because of any exigent circumstances. Nevertheless, the State claims that there were exigent circumstances in this case arising from what it characterizes as an "unusual" DWI investigation that delayed the officers at the restaurant, including the "uncooperative" behavior of O'Brien and Bearden during the investigation and the need to investigate the collision over the phone. However, the focus of the exigent-circumstances analysis is not on the delay attendant to an investigation but on "the delay necessary

---

[19] *McNeely*, 133 S. Ct. at 1561.

[20] *Id*.

[21] *See Amador v. State*, 221 S.W.3d 666, 672-73 (Tex. Crim. App. 2007); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

[22] *Colburn v. State*, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998); *State v. Anderson*, 445 S.W.3d 895, 910 (Tex. App.—Beaumont 2014, no pet.).

to obtain a warrant."[23]  Here, the record supports the trial court's finding that the delay necessary to obtain a warrant would not have "significantly undermined the efficacy" of the blood draw. O'Brien's blood was drawn at the jail, where, according to the evidence presented, there is a magistrate available 24 hours per day who has the ability to review and sign search warrants. Officer Paredes testified that the total amount of time it usually takes him to obtain a warrant at the jail is between 60 and 90 minutes. Although Paredes answered in the affirmative when the prosecutor asked him whether it takes "quite a bit longer" to obtain a warrant when there is a collision involved, Paredes did not specify how much longer it would take, and there is nothing in the record to suggest that it would have taken him so much longer that the blood draw would have been "significantly delayed." In fact, Paredes testified that the paperwork he would have been required to complete in order to obtain a warrant in this case would have been similar to the paperwork he was already required to complete in order to obtain a warrantless blood draw.

Moreover, even without a warrant, O'Brien's blood was not drawn until 4:44 a.m., over two hours after O'Brien had been arrested. The trial court could have reasonably inferred that O'Brien's blood could have been drawn in approximately the same amount of time if Paredes had transported O'Brien to the jail immediately after her arrest at 2:34 a.m. (instead of waiting at the restaurant) and had begun the process for obtaining a warrant immediately upon his arrival at the jail

---

[23] *Schmerber*, 384 U.S. at 770; *see McNeely*, 133 S. Ct. at 1563, ("[E]xigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process."); *Cole v. State*, 454 S.W.3d 89, 103 (Tex. App.—Texarkana 2014, pet. granted) ("As in *McNeely* and *Schmerber*, our exigent circumstances analysis should focus on the delay attendant to obtaining a warrant, i.e., whether the State showed that, under the circumstances, the police could not reasonably obtain a warrant."); *see also Turrubiate v. State*, 399 S.W.3d 147, 151 (Tex. Crim. App. 2013) (observing that State has burden to show "exigent circumstances . . . made obtaining a warrant impracticable").

(instead of waiting outside the jail). This was not a case in which Paredes was acting alone and no other officers were available to assist him.[24] Paredes testified that, in addition to his partner, there was a third officer at the restaurant during the investigation and that this officer was capable of making arrests, inventorying vehicles, and investigating the collision over the phone as Paredes had been doing. Thus, the trial court could have reasonably found that this other officer could have inventoried the BMW, arrested Bearden for public intoxication or waited for her boyfriend to arrive, and continued to investigate the collision, while Paredes and Vasquez transported O'Brien to the jail. Once at the jail, the trial court could have further found, Paredes could have begun the process for securing a warrant while Vasquez waited outside the jail with O'Brien. Additionally, Paredes testified that it would have been possible for him to call the jail prior to his arrival and notify jail officials that he would be requesting a blood draw, which, the trial court could have reasonably inferred, could have further reduced the delay once Paredes arrived at the jail. Under these circumstances, the trial court could have reasonably found, Paredes could have obtained a warrant without "significantly increasing the delay" in drawing O'Brien's blood. On this record, the trial court did not err in concluding that there were no exigent circumstances sufficient to justify dispensing with the warrant requirement.[25] We overrule the State's third point of error.

---

[24] *Cf. Pearson v. State*, No. 13-11-00137-CR, 2014 Tex. App. LEXIS 2514, at *10-11 (Tex. App.—Corpus Christi Mar. 6, 2014, pet. ref'd) (mem. op., not designated for publication) (concluding that there were exigent circumstances present when officer testified that he was "the only officer on duty," was "solely responsible for securing the scene of the accident," and had to wait "at least three hours to obtain a warrant from a judge").

[25] *See McNeely*, 133 S. Ct. at 1561; *Roop v. State*, ___ S.W.3d ___, No. 03-13-00141-CR, 2016 Tex. App. LEXIS 1541, at *14-15 (Tex. App.—Austin Feb. 17, 2016, no pet. h.) (op., designated for publication) (explaining that burden is on State to prove that officer's decision to not seek warrant was result of exigent circumstances); *Huff v. State*, 467 S.W.3d 11, 33-34

11

**Constitutionality of warrantless blood draw**

We next address the State's second point of error, in which it asserts that the trial court erred in concluding that the warrantless blood draw did not comply with the Fourth Amendment. In the State's view, even in the absence of exigent circumstances, the blood draw was constitutionally permissible because it was authorized by the mandatory-blood-draw statute, section 724.012 of the Texas Transportation Code,[26] and because O'Brien "impliedly consented" to the blood draw.[27]

---

(Tex. App.—San Antonio 2015, pet. filed) (finding no exigent circumstances when officer testified that he did not obtain warrant because "it was simply not the practice of San Antonio police officers to obtain a warrant under circumstances such as those presented in this case"); *Cole*, 454 S.W.3d at 103 (concluding that exigent-circumstances exception did not apply when "no attempt was made to obtain warrant," other police officers were available to assist arresting officer, and obtaining warrant would not have significantly delayed blood draw); *Gore v. State*, 451 S.W.3d 182, 197-98 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (concluding that exigent-circumstances exception did not apply when there were "at least two officers on the scene," arresting officer testified that he did not believe warrant was necessary, and there was no evidence of how long it would have taken to obtain warrant); *Sutherland v. State*, 436 S.W.3d 28, 40-41 (Tex. App.—Amarillo 2014, pet. ref'd) (concluding, in case transferred from this Court, that exigent-circumstances exception did not apply when record reflected that "the procedures in place at the Travis County central booking facility have been implemented to streamline the warrant application process" and observing that "the time to complete the warrant application process is not overly burdensome"); *Forsyth v. State*, 438 S.W.3d 216, 220 (Tex. App.—Eastland 2014, pet. ref'd) (concluding that exigent-circumstances exception did not apply when, even though officer testified that warrant process could take 90 minutes, "there was no evidence presented by the State in this particular case of how long [officer] would have had to wait on a warrant").

[26] *See* Tex. Transp. Code § 724.012(b)(1)(C).

[27] *See id*. § 724.011(a) ("If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place, . . the person is deemed to have consented, subject to this chapter, to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance.").

After the parties filed their briefs, the Texas Court of Criminal Appeals decided *State v. Villarreal*, a case that addressed whether warrantless, mandatory blood draws violate the Fourth Amendment.[28] In *Villarreal*, the Court of Criminal Appeals held that "a nonconsensual search of a DWI suspect's blood conducted pursuant to the mandatory-blood-draw and implied-consent provisions in the Transportation Code, when undertaken in the absence of a warrant or any applicable exception to the warrant requirement, violates the Fourth Amendment."[29] The court explained that the Transportation Code provisions on which the State relied to excuse compliance with the warrant requirement "do not, taken by themselves, form a constitutionally valid alternative to the Fourth Amendment warrant requirement," and the court "reject[ed] the State's assertion that a warrantless, nonconsensual blood draw conducted pursuant to those provisions can fall under one of the established exceptions to the warrant requirement."[30]

The *Villarreal* court "further reject[ed] the State's suggestion"—similar to the argument raised by the State here—"that such a search may be upheld under a general Fourth Amendment balancing test."[31] Although the court "agree[d] with the State's contention that the government has a substantial interest in preventing drunk driving," it "disagree[d] that a balancing test is appropriate given the context" of "an active criminal investigation, [] when the primary goal of law-enforcement activity is the gathering of evidence."[32] In that context, the court

[28] *See* 475 S.W.3d at 787.

[29] *Id*. at 815.

[30] *Id*. at 813.

[31] *Id*.

[32] *Id*. at 808-09.

13

observed, the United States Supreme Court has repeatedly held that "a warrantless search of a person is unreasonable unless it falls within an established exception to the warrant requirement."[33] The court "decline[d] to disregard this well-established principle in favor of a more generalized balancing-of-interests test."[34]

The *Villarreal* court also rejected the State's contention that a suspect's "implied consent" to a blood draw obviates the need to obtain a warrant. The court explained that "to constitute a valid waiver of Fourth Amendment rights through consent, a suspect's consent to search must be freely and voluntarily given," and the suspect must possess "the ability to limit or revoke it."[35] According to the court, "[i]t would be wholly inconsistent with these principles to uphold the warrantless search of a suspect's blood on the basis of consent when a suspect has, as in the present case, expressly and unequivocally refused to submit to the search."[36] "That explicit refusal to submit to blood testing," the court concluded, "overrides the existence of any implied consent, and, unless some other justification for the search applies, there remains no valid basis for conducting a warrantless search under those circumstances."[37]

---

[33] *Id*. at 809 (citing *Riley v. California*, 134 S. Ct. 2473, 2482 (2014); *McNeely*, 133 S. Ct. at 1558; *Skinner v. Railway Labor Execs. Ass'n*, 489 U.S. 602, 619 (1989)).

[34] *Id*.

[35] *Id*. at 799.

[36] *Id*. at 800.

[37] *Id*.

This Court and others have repeatedly followed *Villarreal* and rejected the arguments that the State raises here.[38] Consistent with the precedent established in these cases, we overrule the State's second point of error.

**Applicability of exclusionary rule**

Finally, we address the State's first point of error, in which it asserts that, "[e]ven if the police had violated O'Brien's constitutional rights, the exclusionary rule does not apply." The State focuses its argument almost entirely on the federal exclusionary rule, which is a judicially created remedy that requires the suppression of evidence obtained in violation of the Fourth Amendment.[39] As the State observes, there are exceptions to the federal rule based on an officer's good-faith reliance on the law as it existed at the time of the officer's actions.[40]

---

[38] *See State v. Molden*, ___ S.W.3d ___, No. 03-14-00166-CR, 2016 Tex. App. LEXIS 1539, at *4-9 (Tex. App.—Austin Feb. 17, 2016, pet. filed) (op., designated for publication); *State v. Hill*, ___ S.W.3d ___, No. 03-13-00834-CR, 2016 Tex. App. LEXIS 1540, at *3-8 (Tex. App.—Austin Feb. 17, 2016, no pet. h.) (op., designated for publication); *Roop*, 2016 Tex. App. LEXIS 1541, at *11-13; *see also State v. Ayala*, No. 03-14-00651-CR, 2016 Tex. App. LEXIS 2166, at *6-10 (Tex. App.—Austin Mar. 2, 2016, pet. filed) (mem. op., not designated for publication); *State v. Munoz*, 474 S.W.3d 8, 13-14 (Tex. App.—El Paso 2015, pet. ref'd); *State v. Tercero*, 467 S.W.3d 1, 6-9 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *Chidyausiku v. State*, 457 S.W.3d 627, 630-31 (Tex. App.—Fort Worth 2015, pet. filed); *State v. Garcia*, 457 S.W.3d 546, 547-48 (Tex. App.—San Antonio 2015, pet. filed); *Lloyd v. State*, 453 S.W.3d 544, 546-48 (Tex. App.—Dallas 2014, pet. ref'd).

[39] *See Arizona v. Evans*, 514 U.S. 1, 10 (1995); *United States v. Leon*, 468 U.S. 897, 906 (1984).

[40] *See Davis v. United States*, 131 S. Ct. 2419, 2423–24 (2011) (holding that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule"); *Illinois v. Krull*, 480 U.S. 340, 360 (1987) (holding that evidence obtained by officer acting in good-faith reliance on statute that is later determined to be unconstitutional is not subject to exclusionary rule).

However, in her motion to suppress, O'Brien sought to exclude the evidence pursuant to the Texas exclusionary rule, which provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case."[41] It is well established that the Texas exclusionary rule is broader in scope and provides more protection to a suspect than its federal counterpart.[42] The Legislature has authorized only one exception to this rule: "It is an exception to the provisions of Subsection (a) of this Article that the evidence was obtained by a law enforcement officer acting in objective good faith reliance *upon a warrant* issued by a neutral magistrate based on probable cause."[43] There is no exception to the Texas exclusionary rule based on an officer's compliance with the law as it existed at the time of the search or his good-faith reliance on anything other than a warrant. In this case, it is undisputed that there was no warrant. Consequently, the exception to article 38.23 does not apply here, as this and other Texas courts have repeatedly held in

---

[41] Tex. Code Crim. Proc. art. 38.23(a).

[42] *See Wilson v. State*, 311 S.W.3d 452, 458-59 (Tex. Crim. App. 2010); *Miles v. State*, 241 S.W.3d 28, 34 (Tex. Crim. App. 2007); *Melendez v. State*, 467 S.W.3d 586, 592 (Tex. App.—San Antonio 2015, no pet.); *Tercero*, 467 S.W.3d at 10; *see also* 40 George E. Dix & John M. Schmolesky, Texas Practice Series: Criminal Practice and Procedure § 7.10 (3d ed. 2011) ("Article 38.23 of the Code of Criminal Procedure imposes what is probably the broadest state exclusionary requirement of any American jurisdiction."); 1 C. McCormick & R. Ray, Texas Law of Evidence, § 473 (2d ed. 1956) ("The Texas [exclusionary] statute lays down a rule far broader than that existing in any other state and goes much beyond the doctrine of the [federal] cases.").

[43] Tex. Code Crim. Proc. art. 38.23(b) (emphasis added).

16

similar mandatory-blood-draw cases.[44] Because the blood-draw evidence in this case was obtained

in violation of the Fourth Amendment to the United States Constitution, we cannot conclude that the

district court abused its discretion in suppressing the evidence pursuant to the Texas exclusionary

rule.[45] We overrule the State's first point of error.

---

[44] *See, e.g.*, *Molden*, 2016 Tex. App. LEXIS 1539, at *12-14; *Hill*, 2016 Tex. App. LEXIS 1540, at *11-13; *Roop*, 2016 Tex. App. LEXIS 1541, at *16-17; *Munoz*, 474 S.W.3d at 16; *Tercero*, 467 S.W.3d at 10-11; *Burks v. State*, 454 S.W.3d 705, 709 (Tex. App.—Fort Worth 2015, pet. ref'd); *Anderson*, 445 S.W.3d at 912; *Forsyth*, 438 S.W.3d at 224-25; *see also State v. Esher*, No. 05-14-00694-CR, 2015 Tex. App. LEXIS 7722, at *10-11 (Tex. App.—Dallas July 27, 2015, no pet.) (mem. op., not designated for publication); *Gentry v. State*, No. 12-13-00168-CR, 2014 Tex. App. LEXIS 9538, at *6-7 (Tex. App.—Tyler Aug. 27, 2014, pet. ref'd) (mem. op., not designated for publication); *Fitzgerald v. State*, No. 04-13-00662-CR, 2014 Tex. App. LEXIS 8208, at *6 (Tex. App.—San Antonio July 30, 2014, pet. ref'd) (mem. op., not designated for publication).

[45] We note that the applicability of the exclusionary rule to evidence obtained from a warrantless, mandatory blood draw is an issue that is currently pending before the Court of Criminal Appeals. *See Cole*, 454 S.W.3d at 89. But unless and until that court instructs us otherwise, we adhere to the exception to the Texas exclusionary rule that the Legislature has expressly authorized. *See State v. Daugherty*, 931 S.W.2d 268, 270 (Tex. Crim. App. 1996) ("But Article 38.23 already contains one express exception, see Subsection (b) thereof, and according to the rules of statutory construction, where a statute contains an express exception, its terms must apply in all cases not excepted."); *Garcia v. State*, 829 S.W.2d 796, 800 (Tex. Crim. App. 1992) ("Certainly, the Legislature has the prerogative to amend Article 38.23 to enact the specific exception to its rule if it chooses. Until that time, however, we must enforce the statute as written, excluding all illegally obtained evidence, with the single exception as set out in the statute."); *see also* 67 Tex. Jur. 3d *Statutes* § 117 (2015) ("In construing a statute, it is not ordinarily permissible to imply an exception, proviso, or restriction or to enlarge an exception so as to include cases not within its terms."). *Cf. Wehrenberg v. State*, 416 S.W.3d 458, 470-71 (Tex. Crim. App. 2013) (concluding that "independent source doctrine" may be basis for admitting otherwise inadmissible evidence because that doctrine "is consistent with the plain terms of the Texas exclusionary rule"); *State v. Johnson*, 871 S.W.2d 744, 750-51 (Tex. Crim. App. 1994) (reaching similar conclusion regarding "attenuation of taint" doctrine).

**CONCLUSION**

We affirm the trial court's order granting the motion to suppress.

_____

Bob Pemberton, Justice

Before Justices Pemberton, Field, and Bourland

Affirmed

Filed:   April 7, 2016

Do Not Publish